**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **OMNICARE, INC.,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 06 C 6235 |
| | ) |
| **UNITEDHEALTH GROUP, INC.,** | ) |
| **PACIFICARE HEALTH SYSTEMS, INC.,** | ) |
| and **RxSOLUTIONS, INC. d/b/a** | ) |
| **PRESCRIPTION SOLUTIONS,** | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Omnicare Inc. ("Omnicare") filed a five-count complaint against Defendants United-Health Group, Inc. ("UnitedHealth"), PacifiCare Health Systems, Inc.[1] ("PacifiCare"), and RxSolutions, Inc. d/b/a Prescription Solutions ("RxSolutions") (collectively, "Defendants"). Omnicare's First Supplemental and Amended Complaint (the "Amended Complaint") alleged that Defendants had violated the Sherman Act's prohibition on contracts or conspiracies in restraint of trade, 15 U.S.C. § 1 (2000) ("Count I"), as well as a parallel prohibition against antitrust conspiracies in the Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. § 367.175 (West 2006) ("Count II"). Omnicare also charged Defendants with two state-law counts of fraud, and one state-law count of conspiracy to commit fraud. Defendants now move collectively to dismiss Counts I and II. For the reasons stated below, this motion is denied.[2]

---

[1] Defendants have informed the court that PacifiCare has previously been captioned incorrectly as "PacifiCare Health Systems, Inc.," when it is in fact an LLC. (Mot. to Dismiss 1.) Absent a stipulation correcting the record, the court will expect PacifiCare to move for a substitution.

[2] In this opinion, the First Supplemental and Amended Complaint will be cited as "Am. Compl." Defendant's Motion to Dismiss Counts I and II of Plaintiff's First Supplemental and Amended Complaint will be cited as "Mot. to Dismiss." Defendants' Memorandum in Support of Defendants' Motion to Dismiss will be cited as "Defs.' Mem." Omnicare's Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiff's Antitrust Claims" will be cited as "Pl.'s Mem." Finally, Defendants' Reply Brief in Support of Defendants' Motion to Dismiss will be cited as "Defs.'
(continued...)

**FACTS**

The following facts are drawn from Omnicare's Amended Complaint, and are recounted in the light most favorable to Omnicare.

Omnicare is an institutional pharmacy; it provides drugs and services to long-term care facilities. (Am. Compl. ¶¶ 2, 21.) Its business includes providing services tailored to the needs of a frail and elderly population, some of whom pay for their care through the Medicare Part D subsidized drug program. (*Id.* ¶¶ 21-22, 26.) In order to serve Part D enrollees, Omnicare must negotiate deals with Prescription Drug Providers ("PDPs"), who receive premiums from the enrollees as well as federal subsidies, and then reimburse institutional pharmacies such as Omnicare when those pharmacies provide drugs and services to the enrollees. (*Id.* ¶¶ 22, 26-27.)

Medicare Part D was designed, in part, to incorporate competition among PDPs for enrollees to their plans. (*Id.* ¶ 28.) PDPs do compete for enrollees through the quality and quantity of the services they include. (*Id.* ¶ 29.) Thus, in effect, the relationship between PDPs and institutional pharmacies is that of a buyer and seller; PDPs pay firms like Omnicare to provide pharmacy services for their enrollees, with better packages of services being exchanged for higher reimbursement rates. (*Id.* ¶¶ 27-28.) PDPs also, however, generally have an incentive to provide services to the enrollees at the lowest possible cost, and to avoid any increases in the quantity of services covered by their plans. (*Id.* ¶ 27.)

The Centers for Medicare and Medicaid Services ("CMMS"), is a component of the United States Department of Health and Human Services responsible for the rollout of Medicare Part D, CMMS evaluated the applications of the prospective PDPs, and certified the successful bidders to become the first PDPs in September of 2005. (*Id.* ¶¶ 2, 30.) CMMS regulations required PDPs to assemble a network of pharmacies, including institutional pharmacies such as Omnicare that could

---

[2](...continued)
Reply."

provide services to long term care facilities. (*Id.* ¶ 31.) The window in which PDPs could negotiate the provision of such services by pharmacies was only "a few short months," presumably only until the PDPs started functioning as payors on January 1, 2006, although this is unclear from the Amended Complaint. (*Id.* ¶¶ 30-31.)

In July of 2005, Defendant UnitedHealth was a major managed care and health insurance company. (*Id.* ¶ 23.) In July of 2005, UnitedHealth entered into an agreement with Omnicare in which UnitedHealth would act as a PDP, with Omnicare agreeing to accept reimbursement from UnitedHealth for providing pharmacy services to UnitedHealth's enrollees. (*Id.* ¶ 33.) By June of 2006, when the Amended Complaint was filed, UnitedHealth operated in all fifty states, holding a dominant position in many parts of the country. (*Id.* ¶ 23.) UnitedHealth covered about 27% of all nationwide Part D enrollees, and in some regions, it covered in excess of 40% of all Part D enrollees.[3] (*Id.*)

In July of 2005, Defendant PacifiCare was an independent managed care company, providing health insurance to three million health plan members and ten million prescription drug and other specialty plan members nationwide. (*Id.* ¶ 24.) In July of 2005, PacifiCare entered into a merger agreement with UnitedHealth. (*Id.* ¶ 36.) After UnitedHealth and PacifiCare obtained a consent agreement from the Department of Justice's Antitrust Division, which had objected to the combination of the two competitors at a prior unspecified time, this merger was executed, and PacifiCare became a wholly-owned subsidiary of UnitedHealth in December of 2005. (*Id.* ¶ 24, 39.)

Defendant RxSolutions is a wholly-owned subsidiary of PacifiCare and UnitedHealth. (*Id.* ¶ 25.) It provides pharmacy benefits management services to PacifiCare and other managed care

---

[3] Although this fact was not alleged in the complaint, the court notes that UnitedHealth, as of June 2006, was the largest of all the PDPs, thanks in part to a plan endorsement by the AARP, a powerful seniors lobbying group. Amy Merrick, *Getting an 'A' in Part D—While Others Complained, Walgreen Found Way to Profit From Drug Plan for Seniors*, Wall St. J., June 21, 2006, at B1.

organizations. (*Id.*) Its role in this litigation is somewhat unclear, but it has filed no motions separately from the other two Defendants, and indeed, all parties to this litigation refer to it and PacifiCare collectively as a single entity throughout their pleadings. (*E.g.*, *id.* at 1; Defs.' Mem. 1.)

Until the merger was completed, UnitedHealth and PacifiCare were competitors in the market for purchase of institutional pharmacy services in their role as future PDPs. (*Id.* ¶¶ 43-44.) During this time, Omnicare was seeking to provide institutional pharmacy services for PacifiCare's enrollees. (*Id.* ¶ 42.) As part of the merger agreement between UnitedHealth and PacifiCare, PacifiCare was required to obtain UnitedHealth's consent before entering into any Part D agreement with Omnicare. (Am. Compl. ¶ 37.) One provision of the merger agreement prohibited PacifiCare, from the time the merger agreement was executed until the merger was completed, from entering into "any Contract . . . that involves the Company or any of its Subsidiaries incurring a liability in excess of three million dollars ($3,000,000) individually or seven million five hundred thousand dollars ($7,500,000) in the aggregate" without the prior consent of UnitedHealth. (*Id.*)

On July 14, 2005, one week after accepting UnitedHealth's merger offer, but about five months before the merger was complete, PacifiCare informed Omnicare that it would not be willing to negotiate the terms of a contract with Omnicare. (*Id.* ¶¶ 24, 42.) Instead, PacifiCare demanded that Omnicare must accept a noncompetitive reimbursement rate and offer no more than the statutory minimum package of services in order to do business with PacifiCare. (*Id.* ¶¶ 42, 46.) Omnicare alleges that PacifiCare made this demand only after consulting with PacifiCare's competitor, UnitedHealth. (*Id.* ¶ 43.) PacifiCare and UnitedHealth were allegedly willing to take the risk that Omnicare might refuse this demand because it would be possible, after the merger, to fold PacifiCare's plans into the coverage agreement that UnitedHealth had already obtained from Omnicare. (*Id.* ¶ 45.) There was thus no risk that, if the hardball tactic fell through, PacifiCare's enrollees would lack access to Omnicare's services.

On or about November 8, 2005, the CMMS advised that "it is imperative that [long-term

care] pharmacies not withhold contracts with Part D plans to limit the number of plans to which a facility's beneficiaries have access." (*Id.* ¶ 53.) On December 6, 2005, Omnicare, at the urging of the CMMS and in order to prevent any disruption of services to its PacifiCare plan enrollees, accepted PacifiCare's offer. (*Id.* ¶ 54.) Omnicare was thus compelled to accept a below-market reimbursement rate for PacifiCare patients. (*Id.* ¶ 55.) In February of 2006, UnitedHealth, now the owner of PacifiCare, notified Omnicare that it was withdrawing the UnitedHealth plans from its original agreement with Omnicare, and then switched them to the PacifiCare plan, with its lower reimbursement rate. (*Id.* ¶ 60.)

In its Amended Complaint, Omnicare claims that the collusion between UnitedHealth and PacifiCare constituted a violation of the Sherman Act, as a per se illegal scheme to fix prices. (*Id.* ¶¶ 70-72.) Omnicare also claims that the same conduct violated the Kentucky Consumer Protection Act. (*Id.* ¶¶ 79-83.) Defendants have moved collectively to dismiss both of these Counts, on the ground that they fail to state a claim on which relief can be granted. (Defs.' Mem. 1.)

## DISCUSSION

In considering a motion to dismiss, the court tests the sufficiency of the complaint; it does not decide the merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). This involves two "easy-to-clear hurdles": the plaintiff must plead sufficient facts to give fair notice of the claim and the grounds upon which it rests, and those facts, if true, must plausibly suggest that the plaintiff is entitled to relief, "raising that possibility above a speculative level." *EEOC v. Concentra Health Serv., Inc.*, ___ F.3d ___, No. 06-3436, 2007 WL 2215764, at *2 (7th Cir. Aug. 3, 2007) (internal punctuation omitted); *see Bell Atlantic v. Twombly*, ___ U.S. ___, 127 S. Ct. 1955, 1964- 65, 1973 n. 14 (2007). On a motion to dismiss, the court treats all well-pleaded allegations in the complaint as true, and grants all reasonable inferences in the plaintiff's favor. *McMillan v. Collection Prof'ls, Inc.*, 455 F.3d 754, 758 (7th Cir. 2006); *see Bell Atlantic*, 127 S. Ct. at 1965 (requiring plausible grounds for inferences if those inferences are to sustain a complaint).

5

### A. Count I: Antitrust Conspiracy Under the Sherman Act

Omnicare alleges that Defendants have engaged in a "contract, combination or conspiracy in restraint of trade in interstate commerce" in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. A survey of the Seventh Circuit's cases reveals that, in order to state a claim of a section 1 violation, Omnicare must plead facts plausibly suggesting that five elements are satisfied. First, Defendants must have entered into a contract, combination or conspiracy. *Bell Atlantic*, 127 S. Ct. at 1964; *Denny's Marina, Inc. v. Rengro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993). Second, the contract, combination or conspiracy must have resulted in a unreasonable restraint of trade in the relevant market. *Denny's Marina*, 8 F.3d at 1220. Third, Omnicare must have suffered an antitrust injury. *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Local 150, AFL-CIO*, 433 F.3d 1024, 1031 (7th Cir. 2006). Fourth, Omnicare must be a proper plaintiff to bring a private antitrust enforcement action under section 4 of the Clayton Act, 15 U.S.C. § 15. *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481 (7th Cir. 2002). Finally, the restraint of trade must have affected interstate commerce. *Haames v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 778-779 (7th Cir. 1994). Defendants assert that Omnicare has failed to adequately plead the first four of these elements, so the court will consider each one in turn.[4]

#### *1. Contract, Combination, or Conspiracy*

In order to state a claim of a section 1 violation, Omnicare must prove that Defendants engaged in a "contract, combination, or conspiracy." *Bell Atlantic*, 127 S. Ct. at 1964. To prove this element, Omnicare must show that there was either a tacit or express agreement between the Defendants. *Id.* This test is easily met here: Omnicare has alleged that UnitedHealth and PacifiCare entered into an explicit merger agreement which restricted PacifiCare's ability to enter

---

[4] As to the fifth element, all that is needed to plead an effect on interstate commerce is a conclusory statement, because nowadays nearly all antitrust offenses will affect interstate commerce. *Haames*, 33 F.3d at 778-79. Omnicare has alleged that the Defendants' anti-competitive activities affected interstate commerce. (Am. Compl. ¶ 20.)

into contracts. (Am. Compl. ¶¶ 36-37.) After entering this agreement, but before the merger was complete, UnitedHealth and PacifiCare allegedly coordinated their decisions regarding PacifiCare's entry into new agreements. (*Id.* ¶¶ 24, 43.) This is a straightforward allegation of an explicit agreement between the Defendants, satisfying the first element of a Sherman Act section 1 claim.

The court notes that *Bell Atlantic*, which was decided after the briefing in this case had been completed, worked an important alteration in the law of civil pleading, especially as to antitrust claims. *Bell Atlantic*, 127 S. Ct. at 1964-65; *EEOC*, 2007 WL 2215764, at *3. The court does not believe that *Bell Atlantic* alters the analysis on this issue. *Bell Atlantic* holds that a plaintiff must plead more than a bare allegation of conspiracy, coupled with an allegation of parallel conduct and implausible allegations of motive, in order to survive a motion to dismiss. 127 S. Ct. at 1970-73. Here, Omnicare has pleaded an outright agreement, with enough specific facts, including quotations from the agreement itself, to render the allegation of agreement plausible. Nevertheless, given the novelty of this issue, the court's decision will be made without prejudice to a limited additional briefing on the question of whether *Bell Atlantic* should be interpreted differently in its application to the facts of this case.

Defendants, however, argue that Omnicare's "contract, combination or conspiracy" allegation fails as a matter of law, because after the Defendants entered into a merger agreement, they became a single entity for antitrust purposes. (Defs.' Mem. 13-15.) Two legally-separate entities constitute a single antitrust entity when, as a practical matter, they have "a complete unity of interest" so that "their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one." *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984). Examples of such unities of interest include the relationship between a parent corporation and a wholly-owned subsidiary, *id.*, as well as, in some instances, relationships between sister corporations with a common owner, principals and agents, franchisers and franchisees, patent holders and licensees, and the members of rural cooperatives. *See Jack*

*Russell Terrier Network of N. Cal v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1034-35 (9th Cir. 2005) (holding that national breed club and registry, and its regional affiliates, constituted a single antitrust entity, and collecting cases). The key factor is whether there is a "joining of economic resources that had previously served different interests." *Copperweld*, 467 U.S. at 771. Here, the merger agreement took two separate firms that had acted as competitors in the purchasing of institutional pharmacy services (Am. Compl. ¶ 24) and allegedly enabled them to coordinate their decisionmaking. This is logically very different from the alleged "conspiracy" between a parent company and its subsidiary in *Copperweld*, where no independent activity could possibly be lost.

Defendants do not cite any binding authority that would require dismissal on this basis, and this court has not been able to locate any. The one Eighth Circuit case they cite, *International Travel Arrangers v. NWA, Inc.*, 991 F.2d 1389 (8th Cir. 1993), merely stands for the proposition that it would be *possible* for a jury to find that a merger agreement, as a factual matter, had so combined two organizations that they had no separate mind, after the agreement had been made. *Id.* at 1397-98. This is logically and factually distinct from Omnicare's argument, which is that the decision to enter into a merger agreement on certain terms was itself an unlawful agreement. *See Chicago Prof'l Sports Ltd. P'Ship v. NBA*, 961 F.2d 667, 674 (7th Cir. 1992) (stating that "[a]greements limiting to whom, and how much, a firm may sell are the defining characteristics of cartels" and thus cannot justify a reduction of output).

Furthermore, even if it were appropriate to analyze the question of separate identity only after Defendants had entered into the merger agreement, dismissal on this ground would still be inappropriate. After all, although it might be possible, on some set of facts, to find that two corporations planning a merger had lost independent economic identity, it is also possible that they have not. It is at least plausible that two competitor corporations that are going through a process of merger continue to retain separate economic interests. In fact, the merging entities have a unity of interests only to the extent that the merger goes according to plan and remains in the interests

of both companies. For this reason, scholars have argued that firms should be treated as separate actors until a merger is fully consummated, and have criticized the holding of *NWA*. *See* Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1464h & n.39 (2d ed. 2003).

The court concludes that Omnicare has pleaded facts which plausibly suggest that the merger agreement constituted a contract, combination, or conspiracy between UnitedHealth and PacifiCare under section 1 of the Sherman Act.

### 2. *Unreasonable Restraint of Trade*

Next, Omnicare must establish that the merger agreement was an unreasonable restraint of trade in a relevant market. *Denny's Marina*, 8 F.3d at 1220. The first step in this analysis is an inquiry into what rule the court should apply; some allegedly anticompetitive practices are per se illegal, while others are analyzed pursuant to a rule of reason. *See Tri-Gen*, 433 F.3d at 1032; *Denny's Marina*, 8 F.3d at 1220. The difference is important; a practice with strong enough anti-competitive tendencies to be labeled a per se violation is treated as such without reference to its competitive effects in particular cases, *see Tri-Gen*, 433 F.3d at 1032, whereas a plaintiff who wishes to prove a violation using the rule of reason must prove specific anti-competitive effects, which first requires a showing of market power. See *42nd Parallel North v. E St. Denim Co.*, 286 F.3d 401, 404-05 (7th Cir. 2002) (describing the market power requirement). Defendants state that the rule of reason is applicable to their claim, but then note that they are assuming, "[f]or the purposes of this Motion only," that Omnicare has sufficiently pleaded a per se violation. (Defs.' Reply 2 n.1.) Thus, it is effectively conceded that Omnicare has pleaded an adequate claim of a per se violation. Nevertheless, as the issue is an important one, this court will briefly assess which rule is more appropriately applied to Omnicare's claim.

When an agreement between competitors is entered into for the purpose of restraining price competition, and actually does restrain or contribute to the restraint of such competition, such an

9

agreement constitutes price fixing, which is a per se unreasonable practice under section 1 of the Sherman Act. *See Tri-Gen*, 433 F.3d at 1033; *Denny's Marina*, 8 F.3d at 1221. In this case, Omnicare alleges that the UnitedHealth and PacifiCare entered into an agreement that barred PacifiCare from entering into any contracts creating liabilities greater than three million dollars without UnitedHealth's approval. (Am. Compl. ¶ 37.) It is plausible that such an agreement would necessarily restrain price competition between two competitors; PacifiCare could not offer higher prices in an attempt to draw customers away from UnitedHealth, and UnitedHealth would have no need to offer higher prices when it could control PacifiCare's ability to outbid it. Furthermore, given the rather bluntly anticompetitive nature of such an agreement, and given Omnicare's allegations that the two competitors subsequently acted in concert in deciding the PacifiCare would not accept deals unless it was able to pay a noncompetitive reimbursement rate (Am. Compl. ¶¶ 42-44, 55), it can plausibly be inferred that the intent of the agreement was to suppress price competition between the two firms. Whether or not Omnicare can ultimately prove that the merger agreement was so motivated, it has pleaded sufficient facts to plausibly suggest that it can do so after discovery, which is all that is necessary at this stage. *Bell Atlantic*, 127 S. Ct. at 1964.

### 3. *Antitrust Injury*

Next, Omnicare must demonstrate that it has suffered an antitrust injury; that is, an injury that arises from the anticompetitive nature of the charged unlawful practice. *Tri-Gen Inc.*, 433 F.3d at 1031. In a buyers' conspiracy case, a seller sufficiently alleges antitrust injury by pleading that it has received excessively low prices from members of the buyers' cartel. *Int'l Outsourcing Servs., LLC, v. Blistex, Inc.*, 420 F. Supp. 2d 860, 865 (N.D. Ill. 2006) (Bucklo, J.); *Bellevue Drug Co. v. Advance PCS*, No. Civ.A. 03-4731, 2004 WL 724490, at *4 (E.D. Pa. Mar. 2, 2004); Areeda & Hovenkamp, *supra*, ¶ 350b. This is because a buyers' cartel is the mirror image of a sellers' cartel; the harm caused is not artificially raised prices for consumers, but rather artificially lowered prices for sellers. *See Vogel v. Am. Soc'y of Appraisers*, 744 F.2d 598, 601 (7th Cir. 1984) (noting that

10

monopoly and monopsony are symmetrical distortions of competition from an economic standpoint). For this reason, both the Seventh Circuit and the Supreme Court have upheld claims by sellers who purchased goods at artificially lowered prices because of buyers' cartels, albeit without any specific discussion of antitrust injury. *See, e.g., Mandelville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235-36 (1948); *Sanner v. Bd. of Trade of the City of Chicago*, 62 F.3d 918, 927-28 (7th Cir. 1995) (conspiracy to depress soybean prices, intended to benefit soybean buyers, created cause of action in soybean sellers). Omnicare has successful alleged that UnitedHealth and PacifiCare were members of a per se unlawful buyers' conspiracy, and that it received a significantly below-market reimbursement rate as a result of this conspiracy. (Am. Compl. ¶¶ 36-38, 54-55.) Thus, it has adequately alleged that it suffered antitrust injury.

Defendants devote most of their two memoranda to arguing that this element is not satisfied. They make four identifiable arguments to this effect. First, they argue that, as a matter of law, there can be no antitrust injury in the absence of either raised prices or reduced output to consumers. (Defs.' Mem. 8; Defs.' Reply 4.) In support, Defendants marshal dicta from numerous cases that seem to support this claim. *See, e.g., James Cape & Sons Co. v. PCC Constr. Co.*, 453 F.3d 396, 399 (7th Cir. 2006) (stating that antitrust injury "must involve loss that comes from acts that reduce output or raise prices to consumers") (internal citations and punctuation omitted). The authorities cited by the Defendants, however, do not satisfy the court that this reasoning remains valid in a buyers' cartel case.

Many of the cases cited by the Defendants are the more traditional sellers' conspiracy cases, in which there would be no reason to consider the proper rule in a buyers' case. *See U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 625 (7th Cir. 2003) (buyer of natural gas sued a seller of natural gas for allegedly inflating market prices)*; NBA*, 961 F.2d at 669 (suit by television station and a basketball team that received royalties from that station against the NBA, as a seller of the rights to televise basketball games); *Cathedral Trading, LLC v. Chicago Bd. Options Exch.*, 199 F.

11

Supp. 2d 851, 859 (N.D. Ill. 2002) (suit by purchasers of options against seller of options).

In another group of cases cited for this proposition, firms sue their competitors within a market; those cases, too, are inapposite. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 331 (1990) (firm suing a competitor); *James Cape & Sons*, 453 F.3d at 399-400 (suit by one bidder against competing bidders); *Tri-Gen*, 433 F.3d at 1027, 1030 (suit by drilling company against union that was allegedly conspiring with the drilling company's competitors); *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 597, 599 (7th Cir. 1995) (suit by lessor, alleging that he was injured in his role as a competitor for lessees, and in other, less direct ways); *Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.*, 61 F.3d 1250, 1253 (7th Cir. 1995) (suit by tour company against a rival); *Hassan v. Indep. Practice Assocs.*, 698 F. Supp. 679, 681, 685 (E.D. Mich. 1988) (suit by allergists against organization of doctors in competition with them).

Finally, a third group of cases involves allegations that a firm without market power refused to hire or purchase services from a particular individual, without allegations of price fixing or other per se anticompetitive practices by the firm. *See Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 717 (7th Cir. 2006) (suit by doctor against hospital alleging a failure to renew her contract); *Wagner v. Magellan Health Servs. Inc.*, 121 F. Supp. 2d 673, 679-80 (N.D. Ill. 2000) (suit by doctor against managed care organization that refused to refer patients to his care and attempted to get others to remove him from the on-call rotation); *Vakharia v. Little Co. of Mary Hosp. & Health Care Ctrs.*, 917 F. Supp. 1282, 1301 (N.D. Ill. 1996) (suit by doctor challenging the staffing decision of a single hospital without market power).

None of these cases addresses, or even discusses, the appropriate rule applicable to an allegation by a seller of lowered prices because of a per se anticompetitive price fixing scheme by a buyers' cartel. Dicta in these discussions therefore carries little weight when compared with the opinion of courts and authorities that have directly addressed this question and concluded that a seller is injured when buyers collude to lower prices. *Blistex*, 420 F. Supp. 2d at 865; *Bellevue*

*Drug*, 2004 WL 724490, at *4; Areeda & Hovenkamp, *supra*, ¶ 350b.

Defendants' second argument is that ordinary business wrongs not traceable to anticompetitive conduct do not constitute antitrust injury. (Defs.' Mem. 6-8.) This proposition is correct; absent a claimed harm to competition, and an injury traceable to its anticompetitive effects, no antitrust case can proceed. *See U.S. Gypsum*, 350 F.3d at 626-27. But here, Omnicare has in fact alleged both a harm to competition—the claimed conspiracy between the Defendants—and an injury arising out of that violation—the receipt of lowered prices for services supplied to PacifiCare. (Am. Compl. ¶¶ 36-38, 54-55.) Thus, Defendants' attempts to characterize Omnicare's complaint as pleading only "ordinary business torts" fails. (Defs.' Mem. 6.)

Defendants' third argument is that Omnicare cannot plead antitrust injury without alleging harm to other sellers as well as to itself. (Defs.' Mem. 10; Defs.' Reply 8-9.) The cases they cite for this proposition, however, do not support such a rule. *Wagner* deals a doctor's allegations that a managed care provider conspired with others to deny him patient referrals, and properly holds that refusing to deal with one individual is not a harm to competition, absent more. 121 F. Supp. 2d at 681-82. Nowhere does the *Wagner* court state that the problem with the suit was the failure to allege that other doctors had been treated the same way. *Id. Wellwoods Development Co. v. City of Aurora* is even less apt; it holds that a plaintiff that is not a participant in the market where competition is restrained, and that suffers harm only in a fairly indirect way, lacks antitrust standing. 631 F. Supp. 221, 229-30 (N.D. Ill. 1986). All the Seventh Circuit has required is harm to competition and an injury arising out of the violation, not that a plaintiff demonstrate that others were harmed in the same way, so this argument fails as well. *See, e.g., U.S. Gypsum*, 350 F.3d at 626-27.

Finally, Defendants argue that there can be no antitrust injury in a buyers' conspiracy case where Defendants have not been shown to possess market control or to have affected the entire seller's market. (Defs.' Reply 10-11.) Defendants cite no cases that actually assert this proposition;

they merely argue that cases cited by Omnicare involved such facts. (*Id.*) The mere fact that prior cases involved particular facts does not mean that those facts were necessary to their results, of course. In any event, this argument ignores the principle that a buyers' conspiracy to fix prices, which is alleged here, is per se unlawful, so that no proof of market control need be offered. *See Mandelville*, 334 U.S. at 235-36; *Vogel*, 744 F.2d at 601.

Thus, Omnicare has properly pleaded that it suffered an antitrust injury.

### 4. *Proper Plaintiff*

Finally, Omnicare must establish that it is an appropriate plaintiff to bring this action for treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15, which provides for the right of private individuals to enforce the Sherman Act. Although the Clayton Act provides that "any person who shall be injured by reason of anything forbidden in the antitrust laws" may bring an action, *id.*, judicial construction has limited this right to relief to those plaintiffs who can "most effectively vindicate the purposes of the antitrust laws" in a particular case. *Kochert*, 463 F.3d at 718 (internal punctuation omitted). This rule incorporates two components: the direct purchaser rule of *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745-46 (1977), and the proximate cause requirements of *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 545-46 (1983) ("*AGC*"). *Sumitomo*, 306 F.3d at 481. For the reasons explained here, Omnicare has adequately alleged that is a proper plaintiff.

First, Omnicare has satisfied the direct purchaser rule of *Illinois Brick*. *Illinois Brick* precludes recoveries by plaintiffs who have purchased goods from a middleman who purchased directly from an antitrust violator, so long as that middleman could bring a claim against the violator representing the entirety of the plaintiff's injury. *See Sumitomo*, 306 F.3d at 481-82. In a buyers' cartel case, this rule would presumably mean that if Company A had sold to Company B, who then sold to a buyers' conspiracy, and that conspiracy meant that both A and B received reduced prices, only Company B could bring an antitrust claim. *See Blistex*, 420 F. Supp. 2d at 865 (noting that,

14

in a buyers' cartel case, it is the most direct seller who is the proper plaintiff under *Illinois Brick*). This is no bar to Omnicare's suit, as it alleges that it contracted directly with PacifiCare, with no intervening middlemen. (Am. Compl. ¶ 54.)

Next, the court must assess, using the factors set forth in *AGC*, whether Omnicare has alleged a sufficient link between Defendants' conduct and its own injury, such that permitting it to sue will vindicate the purposes of the Clayton Act. *See AGC*, 459 U.S. at 544-45; *Serfecz*, 61 F.3d at 598. Defendants have offered little argument on this point, aside from an assertion that prescription drug consumers, rather than Omnicare, would be better antitrust enforcers. (Defs.' Mem. 12-13; Defs.' Reply 8.) Furthermore, neither party has discussed how this court should apply the *AGC* factors to Omnicare's Amended Complaint. Thus, this court will confine itself to a brief discussion of the factors, paying particular attention to a comparison between the position of Omnicare and potential drug-consumer plaintiffs.

The first *AGC* factor is the causal connection between the alleged violation and the alleged injury. *Sumitomo*, 306 F.3d at 484. Omnicare's Amended Complaint characterizes the causal link as quite direct; Defendants entered into a collusive agreement (Am. Compl. ¶¶ 36-38), they colluded with respect to what contracts PacifiCare would enter into (*id*. ¶¶ 43-44), and as a result, Omnicare was paid lower-than-competitive reimbursement rates. (*Id.* ¶¶ 54-55.) This link is, in the court's view, more direct than what any individual consumer would be able to allege; after all, the lowering of prices paid to Omnicare might, but might not, be passed on to Defendants' consumers. This analysis also suffices to address the fourth *AGC* factor, the directness of the injury. *See Sumitomo*, 306 F.3d at 484.

The second factor is whether Omnicare has alleged an improper motive. *See id*. Omnicare has alleged that UnitedHealth and PacifiCare maintained a conscious commitment to a price-fixing scheme. (Am. Compl. ¶ 72.) As intent and motive may be generally averred in a pleading, *see* Fed. R. Civ. P. 9(b), this is a sufficient allegation of improper motive.

The third factor is the type of injury and whether it was one Congress sought to redress. *Sumitomo*, 306 F.3d at 484. In *AGC*, the court focused this inquiry on whether the plaintiff was a "consumer or competitor" in the market in which trade was restrained. 459 U.S. at 538-39 (noting that the central concern of the Sherman Act was protecting the "economic freedom of participants in the relevant market"). In light of the mirror-image nature of sellers' and buyers' cartels, the court construes this language to include an intent to protect sellers who are the victims of a conspiracy by buyers to suppress prices. *See Mandelville*, 334 U.S. at 235-36 (noting that buyers' cartels are condemned by the Sherman Act, and that the persons specifically injured by such cartels are sellers); *Vogel*, 744 F.2d at 601. Thus, this factor also favors Omnicare, as the seller, over subsequent consumer-purchasers, who may or may not have suffered any injury at all.

The fifth factor is whether the damages are likely to be speculative. *Sumitomo*, 306 F.3d at 484. The court finds it likely that damages will be less speculative for Omnicare, which can charge the difference between a competitive rate and the rate it is actually receiving, than they would be for consumers, who would need to establish what Defendants would be charging them if it had not entered into the buyers' conspiracy and charged Omnicare an unlawfully high rate.

Finally, the sixth factor is the risk of duplicate recovery or complex damage apportionment. *Id.* Defendants have not suggested that allowing Omnicare to sue now, rather than waiting for a class of potential consumer plaintiffs, will create such problems.

Thus, all six factors either favor Omnicare's role as plaintiff, or are neutral with respect to whether Omnicare or Defendants' consumer clients would be better plaintiffs. As both the *Illinois Brick* direct-purchaser rule and the *AGC* proximate cause rule have been satisfied, this court finds that Omnicare is a proper plaintiff in this antitrust action. Further, as the remaining elements of a Sherman Act section 1 claim have also been met, Count I of Omnicare's Amended Complaint survives Defendants' motion to dismiss.

**B.**     **Count II: The Kentucky Consumer Protection Act**

Although Defendants state in their Memorandum in Support of Defendant's Motion to Dismiss that they are seeking to dismiss Count II (Defs.' Mem. 1), which is a claim under the Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. § 367.175, they offer no argument addressed specifically to that claim, in either their opening or reply memoranda. In fact, at no point in this briefing has either party referred the court to any Kentucky legal authorities. Accordingly, this portion of the motion is denied. *See APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002) (noting that it is not the duty of the courts to construct parties' legal arguments for them, and that conclusory arguments are waived).

## **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss Counts I and II of Omnicare's First Supplemental and Amended Complaint (73) is denied.

ENTER:

Dated: September 28, 2007

_____
REBECCA R. PALLMEYER
United States District Judge