## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| OMNICARE, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  No. 06 C 6235 |
| | ) |
| UNITEDHEALTH GROUP, INC., | ) |
| PACIFICARE HEALTH SYSTEMS, INC., | ) |
| and RxSOLUTIONS, INC. d/b/a | ) |
| PRESCRIPTION SOLUTIONS, | ) |
| | ) |
| Defendants. | ) |

### MEMORANDUM OPINION AND ORDER

Plaintiff Omnicare, Inc., is the nation's largest institutional pharmacy—that is, a provider of pharmacy services to persons in health care institutions. UnitedHealth Group ("UnitedHealth") and PacifiCare Health Systems, Inc. ("PacifiCare") are health insurers who provide prescription drug coverage to senior citizens under the Medicare "Part D" program. To qualify under that program, a health insurer must demonstrate to federal regulators that it can provide pharmacy services to individuals in long-term care facilities; a contract with an institutional pharmacy such as Omnicare is one way of doing so. Both UnitedHealth and PacifiCare entered into negotiations with Omnicare, and UnitedHealth signed an agreement with Omnicare before UnitedHealth was certified under the Medicare Part D program. During the same time period, UnitedHealth and PacifiCare were engaged in merger talks that culminated in a Merger Agreement between the two parties. PacifiCare broke off its negotiations with Omnicare a week after signing the Merger Agreement and then proceeded to obtain federal certification without Omnicare in its contract "network." PacifiCare later resumed contract talks with Omnicare, ultimately striking a deal far more favorable to it than the one UnitedHealth had achieved. Then, once the UnitedHealth-PacifiCare merger was complete, UnitedHealth abandoned its own deal with Omnicare and took advantage of the more favorable terms in PacifiCare's contract with Omnicare.

In this lawsuit, Omnicare contends that the merger violated antitrust laws and that Defendants are liable for fraud. The court denied Defendants' motion to dismiss, *see Omnicare, Inc. v. UnitedHealth Group, Inc.*, 524 F. Supp.2d 1031 (N.D. Ill. 2007), and the parties proceeded with discovery. Defendants now move for summary judgment on these claims and, for the reasons that follow, the motion is granted.

## FACTUAL BACKGROUND

### I.  Medicare Part D

Medicare is a health insurance program administered by the federal government in order to provide coverage to elderly and disabled Americans. *See* 42 U.S.C. § 1395 *et seq.* In 2003, Congress enacted the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, which created a voluntary prescription drug benefit for seniors called Medicare Part D. Pub. L. No. 108-173, 117 Stat. 2066 (2003). Under Part D, the Centers for Medicare & Medicaid Services ("CMS") make payments to Prescription Drug Plan ("PDP") sponsors—typically insurance providers. PDPs, in turn, pay prescription drug providers—retail and institutional pharmacies—for providing pharmacy services to the individuals enrolled in the PDP. *See* 42 U.S.C. § 1395w-115. The PDP sponsors are compensated in two ways: through payments from CMS and through premiums paid by enrollees. *Id.* The prescription drug providers receive their payments pursuant to contracts with the PDP sponsors.

To participate in Part D, which went into effect on January 1, 2006, PDP sponsors were required to be approved by, and enter into a contract with, CMS. (Bagley Report ¶ 17, App. 155 to Mem. in Supp.) CMS divided the United States into thirty-four "PDP regions," and a PDP sponsor had to be approved for each region in which it wished to operate. As part of its bid for CMS approval, a Part D sponsor needed to demonstrate that it had sufficient pharmacy providers in its network in the PDP region to service both retail customers and patients in long-term care facilities ("LTCs"). (3/16/05 Long-Term Care Guidance, App. 57 to Mem. in Supp.) PDPs were

required to provide a list of contracts with pharmacies that serve LTCs in order to "ensure that all of [the sponsor's] future Part D enrollees who are institutionalized can routinely receive their Part D benefits through the plans' network of pharmacies" rather than through "out of network" pharmacies. (*Id.* at 4.) CMS referred to this requirement of nearby, in-network pharmacies providing services to LTC enrollees as the "convenient access" standard. (*Id.*) In addition, CMS required PDP sponsors to offer a contract to any pharmacy willing and able to participate in the sponsor's LTC network.[1] (*Id.*)

In 2006, 23 million out of 42 million eligible seniors participated in Medicare Part D. (Ex. A to Rubinfeld Decl. ¶ 31, Attach. to Mem. in Opp'n.) Seniors can become enrolled in a PDP in one of two ways. First, seniors eligible for Medicare can simply choose to participate in Part D. Second, individuals who also qualify for Medicaid—another federal insurance program, one designed to provide coverage for individuals and families with low incomes—are automatically enrolled by the government. These low-income seniors, called "dual eligibles" because they are eligible for both Medicare and Medicaid, are enrolled in PDPs whose premiums are lower than an established cap set by CMS. (*Id.* ¶ 34.) These enrollees are technically free to switch to any other plan that falls below the cost threshold established by CMS, but a number of factors—such as the physical impairment of these enrollees and bureaucratic obstacles—make this a rarely-used option. (Rubinfeld Decl. ¶ 6(c), Attach. to Mem. in Opp'n.) Dual eligibles are fully subsidized by the federal government, which pays for both premiums and co-payments for the drugs, and constitute up to 65% of LTC residents. (Ex. A to *id.* ¶¶ 34-35.) Overall, though, Omnicare concedes that all individuals living in LTCs, including both dual-eligibles and voluntary enrollees, comprise only about

---

[1] In addition to being certified as a PDP, insurers could also obtain certification as a Medicare Advantage Prescription Drug Plan ("MAPD"), which functions as an HMO in addition to providing prescription drugs. For 2006, 72% of Part D enrollees were enrolled in standalone PDPs, while 28% were enrolled in MAPDs. (Ex. A to Rubinfeld Decl. ¶ 33, Attach. to Mem. in Opp'n.) Among LTC enrollees, MAPDs were even less common. (*Id.*)

3-5% of total PDP enrollees.  (Mem. in Opp'n at 6 n.7.)  Defendants' negotiations and resulting contracts with Omnicare, the largest LTC pharmacy in the nation, covered only LTC patients. (Omnicare's Supplemental Statement of Undisputed Material Facts ¶¶ 23, 31.)

## II.    Merger

UnitedHealth and PacifiCare, insurance providers who sought CMS certification as PDP sponsors in 2005, initiated merger discussions in January 2005.  (Defs.' 56.1 ¶ 16.)  As talks between the two entities intensified in the weeks leading up to signing the Merger Agreement on July 6, they entered into two separate confidentiality agreements dictating how information deemed "confidential" or "highly confidential" was to be exchanged during the "due diligence" period.[2] (Defs.' 56.1 ¶ 17.)  Although there were some failures to comply with terms of the confidentiality agreements (Omnicare's Resp. to Defs.' 56.1 ¶¶ 17-19), the purpose for the agreements was apparent.  The first confidentiality agreement, designed to protect confidential information, made that information available only to members of UnitedHealth's due diligence team and prevented them from sharing it with others outside that team.  (Defs.' 56.1 ¶ 17.)  The second confidentiality agreement created a "clean room" for highly confidential material and permitted only members of UnitedHealth's "clean team," a subgroup of the due diligence team, to have access to the materials. (*Id.* ¶ 18.)  In addition, prior to the sharing of any information between the two parties, PacifiCare's outside antitrust counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), developed a "data room" where Skadden attorneys reviewed all PacifiCare's documents to determine the propriety of sharing them with UnitedHealth.  (*Id.* ¶ 19.)

Although much of the due diligence process had no relationship to the companies' plans for Part D, several meetings and other exchanges of information concerning Part D did take place.  On

---

[2]      Companies considering a merger frequently share "significant quantities of competitively sensitive information regarding their respective businesses in the course of investigatory 'due diligence'" in order for each party to determine whether the business deal makes sense.  *See* ANTITRUST ADVISER § 3:74, at 3-270 (Irving Scher ed., 4th ed. 2007).

4

June 9, 2005, UnitedHealth and PacifiCare met specifically to discuss PacifiCare's Part D program.[3] (*Id.* ¶ 22.) At the meeting, Jacqueline Kosecoff, an Executive Vice President at PacifiCare, made a presentation entitled "Part D Prescription Drug Program," which included general information regarding administrative expense estimates and information about RxSolutions, a wholly-owned subsidiary of PacifiCare responsible for negotiating contracts with pharmacies on PacifiCare's behalf. (Part D Prescription Drug Program, App. 31 to Mem. in Supp.) From Kosecoff's presentation itself and notes prepared after the meeting, it appears that no pricing information was provided in the presentation outside of an assertion that PacifiCare would follow "an aggressive pricing strategy." (*Id.*; 6/17/05 Memo, App. 26 to Mem. in Supp.) Tom Paul, a UnitedHealth official, noted in a summary prepared after the meeting that PacifiCare provided only "little information" that was "very general," and stated that, based on the meeting, "[t]here is insufficient information to draw any due diligence conclusions about this important program." (*Id.*) To that end, UnitedHealth sent PacifiCare a list of questions concerning Part D on June 22. (Defs.' 56.1 ¶ 24.) In PacifiCare's response to the document, PacifiCare disclosed its "expected average brand discount off of AWP,"[4] which was in fact the same rate that Omnicare ultimately agreed to in its contract with PacifiCare's agent, RxSolutions, in December 2005. (Part D Questions, Ex. 50 to Mem. in Opp'n, at UN008817.)

---

[3] The June 9 meeting included, from PacifiCare, Jacqueline Kosecoff (Executive Vice President), Greg Scott (CFO), and Chris Karkenny (official in Corporate Development); from UnitedHealth, officials included Ed Lagerstrom (head of Corporate Development), Jerry Knutson (CFO of Ovations, UnitedHealth's senior business component), Rick Jelinek (President of Ovations' Senior and Retiree Services), and Tom Paul (CEO of a UnitedHealth subsidiary). (Due Diligence Summary–Point Part D, Ex. 38 to Mem. in Opp'n; Omnicare's Resp. to Defs.' 56.1 ¶ 23.)

[4] In the parties' submissions, the acronym "AWP" is alternatively used to refer to both an "Any Willing Provider" contract and a recognized industry rate known as "Average Wholesale Price." To avoid confusion, the court uses "AWP" only to refer to "Average Wholesale Price," and will write out the phrase "Any Willing Provider."

At a meeting between the parties on June 28, 2005,[5] approximately one week prior to the signing of the Merger Agreement, PacifiCare provided UnitedHealth with Part D information regarding "(1) product and distribution strategies, (2) benefit plan designs, and (3) financial assumptions," including PacifiCare's average low and average high plan pricing information from a sampling of regions. (Defs.' 56.1 ¶ 23.) On July 2, Peter Frank, an outside actuary retained by UnitedHealth who does not appear to have formally been a member of UnitedHealth's due diligence team, met with PacifiCare officials to exchange information about the Part D program. (*Id.* ¶ 25.) At this meeting, PacifiCare disclosed national average bid information for its Part D plans, and Frank provided corresponding information concerning UnitedHealth's Part D business. (*Id.*) The following day, Frank prepared a written summary of the meeting for UnitedHealth officials, in which he disclosed the profit margin PacifiCare expected in its Part D bids. (7/5/05 e-mail from Frank to Jelinek, App. 41 to Defs.' 56.1.) Frank also emphasized that his report was lacking in many specifics, including the names of the PacifiCare officials with whom Frank met "in case [the UnitedHealth officials receiving the report] may know any of them." (*Id.*) Frank further emphasized that "no information on regional bids or on distribution of expected enrollment by region is available. What you see [in the report] is most of what we have." (*Id.*) Frank also noted that he "prepared the report quickly under some time pressure to get a copy to the lawyers so that any potential competitively sensitive info could be removed from the report."[6] (*Id.*) Edward Lagerstrom, the head of UnitedHealth's Corporate Development at the time of the merger, agreed that UnitedHealth received limited information, stating in his deposition that UnitedHealth "wanted to be absolutely

---

[5] The June 28 meeting consisted mostly of the same personnel involved in the June 9 meeting. A few additional individuals participated on June 28, however, including Lois Quam (CEO of Ovations), Peter Frank (outside counsel for UnitedHealth), and Howard Phanstiel (CEO of PacifiCare). (Due Diligence Summary–Point Part D, Ex. 38 to Mem. in Opp'n; Omnicare's Resp. to Defs.' 56.1 ¶ 23.)

[6] The record does not reflect whether UnitedHealth's attorneys did in fact see the report or whether the attorneys made any changes to it.

clear that [PacifiCare's PDP was not] going to lose a lot of money, but I did not need to see the long-term care contracts, particularly given that our antitrust attorney said that we could not see them. So we did not see them." (Lagerstrom Dep. at 218:8-14, App. 22 to Mem. in Supp.)

On July 6, 2005, the two parties signed the Agreement and Plan of Merger ("Merger Agreement"), which announced UnitedHealth's planned purchase of PacifiCare for approximately $8.8 billion. (Defs.' 56.1 ¶ 6.) Section 5.01 of the Merger Agreement prohibits PacifiCare from entering into any contracts before the consummation of the merger, other than those entered into in the ordinary course of business, "without [UnitedHealth's] prior written consent . . . that involves [PacifiCare] or any of its Subsidiaries incurring a liability in excess of three million dollars." (Merger Agreement § 5.01(a)(x), Ex. 72 to Mem. in Opp'n.) The December 2005 contract between RxSolutions and Omnicare generated about $130 million in revenue for Omnicare, which would appear to trigger the requirement of the Merger Agreement that PacifiCare secure UnitedHealth's approval for the Omnicare contract. (Capell Decl. ¶ 6, Attach. to Mem. in Opp'n.) However, Defendants have also provided a Company Disclosure Letter ("Letter"), referred to in § 5.01 of the Merger Agreement,[7] which appears by its terms to carve out an exception to the approval requirement. Specifically, the Letter provides that PacifiCare "and its Subsidiaries may enter into or amend any Contracts relating to their Part D standalone business" without seeking approval from UnitedHealth. (Company Disclosure Letter § 5.01(a)(1), Attach. to Phanstiel Decl., App. 47 to Mem. in Supp.)

The United States Department of Justice ("DOJ") reviewed the terms of the Merger Agreement to determine its potential effects on competition. (Defs.' 56.1 ¶¶ 7-8.) Subject to certain

---

[7]       Specifically, the Merger Agreement states that PacifiCare may not enter into contracts (other than those required in the ordinary course of business) in excess of $3 million prior to the completion of the merger, "except as required by applicable Law . . . or provided in Section 5.01(a) of the Company Disclosure Letter and except as expressly contemplated by this Agreement." (Merger Agreement § 5.01(a), Ex. 72 to Mem. in Opp'n.)

divestitures, none of which directly concerned Part D, DOJ approved the merger, and the transaction closed on December 20, 2005. (*Id.*)

## III.  PDP Approval & Negotiations with Omnicare

In addition to working on the merger, both UnitedHealth and PacifiCare spent much of the 2005 calendar year developing their PDPs to obtain approval from CMS for 2006. As explained above, a critical component to achieving CMS approval was entering into contracts with prescription drug providers, both for retail and LTC customers. To assist in the negotiations with these pharmacies, potential PDP sponsors contracted with pharmacy benefit managers ("PBMs"), who would act as brokers, negotiating contracts with institutional pharmacies on behalf of potential PDPs. Walgreens Health Initiatives, Inc. ("WHI") served as the PBM for UnitedHealth (and other PDP sponsors) in negotiating contracts with certain pharmacies on behalf of UnitedHealth. (Defs.' 56.1 ¶ 10.) PacifiCare utilized RxSolutions, an internal PBM that is a wholly-owned subsidiary of PacifiCare, to conduct its negotiations. (*Id.* ¶ 3.)

Omnicare is the largest pharmacy servicing LTC facilities in the country. (Ex. A to Rubinfeld Decl. ¶ 21, Attach. to Mem. in Opp'n.) In June 2005, Omnicare distributed its template pharmacy-network contract, which included a section called the "18 Patient Protections" (the "Patient Protections" or "Protections"). (Defs.' 56.1 ¶ 37.) According to Omnicare, the provisions grew out of an awareness of Omnicare's importance in the LTC marketplace and were designed primarily "to address the specific health and safety needs of nursing home residents, who require a higher standard of care." (Mem. in Opp'n at 8.) The Protections did provide certain benefits to plan enrollees; for example, one provision provision granted residents up to 180 days to transition from drugs not included in the plan to drugs that are, and another provision required the PDP sponsor to waive certain requirements that could delay the provision of drugs to LTC residents. (Mem. in Opp'n at 8.) Omnicare further contends that the Patient Protections represent best clinical practices.

Indeed, some potential defense witnesses acknowledged this in their depositions. (Bagley Dep 260:1-13, Ex. 96 to Mem. in Opp'n; Infante Dep. 158:17-19, Ex. 164 to Mem. in Opp'n.)

The parties differ greatly in their characterizations of the Patient Protections, however. Defendants argue that many of the Patient Protections in fact violate Medicare regulations and would render a PDP ineligible to receive reimbursement from CMS. (Infante Memo at 1, App. 133 to Mem. in Supp.) In the opinion of outside counsel Marie Infante, who was retained by UnitedHealth, the violations would render UnitedHealth ineligible to receive reimbursement from CMS under Part D for its provision of drugs to LTC patients.[8] (*Id.*) Among other objections concerning the scope of the coverage afforded by the Patient Protections, Infante wrote that the Protections also impermissibly shifted the obligation of the PDP to respond to inquiries from enrollees to Omnicare. (*Id.* at 1-3.) Defendants also argue that PDP sponsors "had a rational economic incentive" not to agree to the Patient Protection provisions because those provisions would increase the costs of providing prescription drugs to the LTC patients. (Defs.' 56.1 ¶ 41.) Omnicare argues that the Protections were in fact in the economic interest of the sponsors because the sponsors had an interest in contracting with Omnicare (based on its large size). (Omnicare's Resp. to Defs.' 56.1 ¶ 41.) Further, Omnicare contends, because the Protections were favorable to potential enrollees, their adoption would enhance the PDPs' efforts to market themselves to potential enrollees. (*Id.*)

---

[8] Omnicare suggests that Ms. Infante's conclusions were actually written as an advocacy piece prepared in response to UnitedHealth's request for the "strongest legal arguments" in favor of a finding that the Protections are unlawful. (Omnicare's Resp. to Defs.' 56.1 ¶ 41; Ex. 163 to Mem. in Opp'n.) An e-mail from Infante to Tobin does state that Infante "decided to use the statutory framework because it provided the simplest way to outline *your strongest legal arguments.*" (Ex. 163 to Mem. in Opp'n (emphasis added).) The memorandum itself nowhere suggests that it was written with a predetermined result, however ("As requested, I have reviewed the Pharmacy Network Agreement . . . and conclude, for the reasons outlined below, that the prescription drugs provided under this agreement would not qualify for reimbursement under Medicare Part D." [Infante Memo at 1, App. 133 to Mem. in Supp.]), and both Infante and Tobin maintain that Infante's conclusions were not dictated by UnitedHealth. (Tobin Dep. 333:14-17, Ex. 159 to Mem. in Opp'n; Infante Dep. 96:2-17, Ex. 164 to Mem. in Opp'n.)

## A.   WHI-Omnicare Agreement

On July 29, 2005, after two months of negotiations, WHI, acting as the PBM for UnitedHealth as well as four smaller PDPs, entered into a pharmacy-network agreement with Omnicare (the "WHI-Omnicare Agreement"). (Defs.' 56.1 ¶¶ 11, 49.) In these pharmacy network contracts, the pharmacy is reimbursed for prescription drugs at a rate calculated as a percentage discount from the average wholesale price ("AWP"), plus a dispensing fee. (*Id.* ¶ 39.) The PDP's economic interest is to obtain a large discount from AWP, and a small dispensing fee. (*Id.* ¶ 40.) The Agreement also contained Omnicare's 18 Patient Protections, as did all the pharmacy-network agreements that Omnicare entered into prior to the August 1, 2005 deadline for PDPs to submit their LTC networks to CMS. (*Id.* ¶ 42.) In addition, the WHI-Omnicare Agreement provided that it would apply to any pharmacy acquired by Omnicare, but did not contain a parallel provision extending its reach to any PDP acquired by UnitedHealth. (*Id.* ¶ 52.) Omnicare contends that as a matter of interpretation, a PDP acquired by UnitedHealth would "automatically [be] covered under the WHI Agreement," but the Agreement contains no explicit provision providing for such a contingency. (Omnicare's Resp. to Defs.' 56.1 ¶ 52.) Finally, Omnicare acknowledges that the Agreement did not contain any provision "that would have prevented [UnitedHealth] from withdrawing the [UnitedHealth] Part D plans from the WHI-Omnicare Agreement and switching them to another Part D pharmacy network." (*Id*; Omnicare's Resp. to Request to Admit No. 21, App. 56 to Mem. in Supp.)

## B.   RxSolutions-Omnicare Agreement

The negotiations between Omnicare and RxSolutions, PacifiCare's internal PBM, were considerably more complicated and drawn out. According to Defendants, PacifiCare's strategy was to set up its pharmacy networks using the RxSolutions template contract—called an "Any Willing Provider" contract—rather than using contracts prepared by pharmacies. Consistent with that strategy, in 2005, RxSolutions did not sign any contract that was prepared by a retail or LTC

pharmacy. (Defs.' 56.1 ¶¶ 56, 59.) The standard reimbursement rate provided in the RxSolutions "Any Willing Provider" contract was substantially more favorable for the PDP than the one established by the WHI-Omnicare Agreement, providing both a lower dispensing fee and a greater discount from AWP. (*Id.* ¶ 57.)

On June 6, 2005, in the course of its negotiations on behalf of PacifiCare, RxSolutions sent a copy of its "Any Willing Provider" contract to Omnicare. (*Id.* ¶ 59.) Later that day, Tim Bien, Omnicare's Senior Vice-President of Professional Services who was responsible for negotiating pharmacy-network contracts with PBMs, participated in a conference call with RxSolutions and PacifiCare in which Bien stated that he would send a copy of Omnicare's form contract to RxSolutions. (*Id.* ¶¶ 36, 60.) Bien did so on June 21. (*Id.* ¶ 61; 6/21/05 e-mail from Smith to Anchondo, App. 73 to Mem. in Supp.) Both Omnicare and RxSolutions pushed for use of its own form contract as the basis for further negotiations; Robert Hill at Omnicare suggested that RxSolutions make revisions to Omnicare's form contract, but expressed a willingness for some flexibility by noting that the mark-up "will not commit Prescription Solutions to necessarily using Omnicare's form of agreement." (Defs.' 56.1 ¶ 63; 6/24/05 e-mail from Hill to Cortes, Ex. 91 to Mem. in Opp'n.) By the time of their next conference call on July 6, Bien noted that the parties were still "way off on price," but PacifiCare agreed to suggest changes to the Omnicare form contract rather than continue to insist upon its own. (Defs.' 56.1 ¶ 65; Bien Dep. 204:6-205:7, App. 18 to Mem. in Supp.) Rochele Cortes, a Pharmacy Contracting Manager at RxSolutions, did mark up the Omnicare form contract, noting in several places RxSolutions's position that various provisions, especially the Patient Protections, were either untenable from a business standpoint or violated CMS regulations; as of July 2005, Omnicare refused to agree to a contract that did not contain the Patient Protections. (Defs.' 56.1 ¶¶ 66-67; App. 75 to Mem. in Supp.)

According to Defendants, this impasse caused PacifiCare to conclude it would be unable to reach an agreement with Omnicare prior to the August 1 deadline and therefore broke off the

negotiations. (Defs.' 56.1 ¶ 68.) Omnicare contends in this lawsuit that PacifiCare's termination of negotiations was actually the result of a conspiracy with UnitedHealth, designed to obtain more favorable rates from Omnicare for both PacifiCare and UnitedHealth. (Omnicare's Resp. to Defs.' 56.1 ¶ 68.) On July 14, about one week after PacifiCare and UnitedHealth signed the Merger Agreement, the negotiations between PacifiCare and Omnicare broke down. Rochele Cortes at RxSolutions sent Bien an e-mail stating, "We regret to inform you that based on the Omnicare agreement and the counteroffer rate . . . we will not be engaging in a contract at this time with your company for Medicare Part D. Please feel free to contact me with any comments or questions." (7/14/05 e-mail from Cortes to Bien, App. 78 to Mem. in Supp.) Bien responded by saying, "Thanks for letting me know. We stand ready to negotiate should you decide to do so." (7/15/05 e-mail from Bien to Cortes, App. 78 to Mem. in Supp.) The next day, RxSolutions Director of Network Relations David Chaney e-mailed Cortes, "This time next year, after we merge with United, they [i.e. Omnicare] will be begging to come in." (7/15/05 e-mail from Chaney to Cortes, App. 80 to Mem. in Supp.) Cortes responded, "Let them beg!" (7/15/05 e-mail from Cortes to Chaney, App. 80 to Mem. in Supp.)

After breaking off negotiations with Omnicare, PacifiCare determined that its LTC network was 80-90% complete (i.e. PacifiCare had contracted with pharmacies within 75 miles of 80-90% of the LTC facilities where it had enrollees). (Defs.' 56.1 ¶ 72.) Defendants claim that PacifiCare intended to fill in the remaining gaps in its network with smaller, independent pharmacies; according to Omnicare, given how small these independent pharmacies were, that was not a realistic goal. (Omnicare's Resp. to Defs.' 56.1 ¶ 72.) In August 2005, CMS declared that PacifiCare's existing LTC network was deficient and informed PacifiCare that it needed to contract with additional pharmacies. (Defs.' 56.1 ¶ 77.) According to Cortes, PacifiCare considered approaching Omnicare to make up the gaps in its network; Omnicare disputes this, noting that after negotiations broke down in July, PacifiCare officials commented that Omnicare "shouldn't hold [its] breath" in waiting

to hear back from PacifiCare. (Omnicare's Resp. to Defs.' 56.1 ¶ 78; 7/15/05 e-mail from Chaney to Cortes, Ex. 100 to Mem. in Opp'n.) In any event, PacifiCare decided that, given the short time frame (three days) that CMS provided to PacifiCare to cure the gaps, PacifiCare could satisfactorily plug the gaps by contracting with Managed Health Care Associates, Inc. ("MHA"), an organization that represented a number of smaller LTC pharmacies and with whom PacifiCare had fewer outstanding disagreements than it had with Omnicare. (Defs.' 56.1 ¶ 78.) Even with MHA in its network, CMS initially concluded that PacifiCare's LTC network was still deficient in one region, but after learning that PacifiCare in fact had seven LTC pharmacies in the region at issue (the District of Columbia), CMS approved PacifiCare as a national PDP on September 30, 2005. (*Id.* ¶¶ 80-81.) CMS also certified at least one other national PDP, Humana, without Omnicare in its network. (*Id.*)

Omnicare changed its strategy in late 2005 and early 2006 to accept contracts with PDPs that did not contain the Patient Protections. (Omnicare's Resp. to Defs.' 56.1 ¶ 107.) The reasons for the change, according to Omnicare, were to enable Omnicare to provide coverage for as many of its LTC patients as possible, and to respond to increasing pressure from CMS to do so. (Bien Dep. 127:12-128:4, Ex. 79 to Mem. in Opp'n.) PacifiCare, on the other hand, argues the change in strategy was caused by a weaker negotiating position and a concern that Omnicare might lose clients if it did not contract with more PDPs. Defendants point to an e-mail Bien received from other Omnicare officials that stated, "Two [LTC] facility Executive Directors indicated it would be easier to change pharmacies than to change that many patients . . . [which] underlines the need that exists . . . to have a contract with [PacifiCare]." (11/30/05 e-mail from Evans to Bien, App. 104 to Mem. in Supp.) Omnicare denies that any threatened loss of business was significant and insists that no such concern had any bearing on its strategy shift in late 2005. (Omnicare's Resp. to Defs.' 56.1 ¶ 99.) In any event, it is undisputed that the majority (fifteen out of twenty-one) of the contracts that Omnicare entered into between August 1, 2005 and April 1, 2006 were PDP-written contracts that did not contain the Patient Protections. (*Id.* ¶ 43.) As of February 2006, the PDP-written contracts

without the Protections governed over one-third of Omnicare's Part D business (including the RxSolutions contract, described below). (*Id.* ¶ 83.)

Presumably in order to determine whether Omnicare should resume its efforts to contract with PacifiCare, on October 17, 2005, Bien at Omnicare e-mailed Craig Stephens, the Vice President in charge of UnitedHealth's Part D contracting, asking, "Is there a sense of when United will close the acquisition of PacifiCare? When the deal closes, will PacifiCare be contracted with Omnicare as a result of the acquisition? Thanks for your help on this."[9] (Defs.' 56.1 ¶¶ 48, 84.) Stephens did not reply to this e-mail before conferring with other UnitedHealth officials, including Ann Tobin, counsel at UnitedHealth. Forwarding Bien's e-mail, Stephens wrote to Tobin, "Interesting—should we assume PacifiCare has not agreed with Omnicare?" (*Id.* ¶ 85.) After another e-mail from Bien pressed him for a reply, Stephens finally wrote back on October 31, explaining that "PacifiCare's Part D offering for 2006 is a unique contract with CMS. If and when the deal closes, PacifiCare will follow their own Part D product strategy throughout the 2006 calendar year." (*Id.* ¶ 87.) The next day, Bien forwarded this response to Omnicare CEO Joel Gemunder, noting his conclusion that "PacifiCare will not be included with the United Part D offering." (*Id.* ¶ 93.)

Shortly thereafter, Omnicare did contact PacifiCare to resume negotiations. (*Id.* ¶ 95.) PacifiCare asserts that, even though CMS had approved its LTC pharmacy-network without Omnicare, PacifiCare remained interested in negotiating with Omnicare in order to expand its network. (*Id.* ¶ 96.) Omnicare argues that PacifiCare actually still *needed* Omnicare, because it was concerned that CMS might heighten the "convenient access" standard by requiring that a

---

[9] The record does not reflect when or how Bien and Omnicare learned of the merger. Even if neither of the merging parties informed Omnicare of the merger prior to the signing of the Merger Agreement, Omnicare surely learned of the merger shortly thereafter, as news of the merger was widely reported, including on the front page of the *Wall Street Journal*. Vanessa Fuhrmans et al., *Two Health Plans Agree on a Deal for $8.1 Billion—UnitedHealth Adds Heft in California and Medicare with Move on PacifiCare*, WALL ST. J., July 7, 2005, at A1.

PDP's LTC enrollees reside even closer to the pharmacies that provided their drugs. (Omnicare's Resp. to Defs.' 56.1 ¶ 96.) Specifically, Omnicare points to testimony from Angelo Giambrone, the RxSolutions Vice President of Industry and Network Relations, suggesting PacifiCare was concerned that CMS might be "raising the bar" regarding convenient access standards. (Giambrone Dep. 183:12-19, Ex. 86 to Mem. in Opp'n.) At Bien's request, in mid-November, Cortes again sent him the RxSolutions form contract, which PacifiCare claims it still wanted to use as the starting point for any negotiations. (Defs.' 56.1 ¶¶ 95, 97.) Together with the RxSolutions "Any Willing Provider" contract, Cortes sent an e-mail saying, "We will need to work with this document in order to proceed." (11/18/05 e-mail from Cortes to Bien, App. 102 to Mem. in Supp.) Omnicare claims that it understood that the form contract proposal was a "take it or leave it" proposition and not an invitation to commence negotiations; in particular, Bien testified that because of time restrictions—Omnicare wanted to finalize its Part D network before January 1, 2006—he asked PacifiCare and RxSolutions "for their best contract that they would give us, and I believe [the "Any Willing Provider" contract] was purported to be that." (Omnicare's Resp. to Defs.' 56.1 ¶¶ 97-98; Bien Dep. 434:13-435:7, App. 18 to Mem. in Supp.)

In any event, after receiving the RxSolutions form contract, Omnicare made no attempt to negotiate any of its terms—not even the reimbursement rate—and simply signed the contract on December 6, 2005. (Defs.' 56.1 ¶¶ 100-101.) Chaney at RxSolutions testified that he was surprised that Omnicare made no attempt to negotiate any terms. (Chaney Dep. 124:18-22, App. 67 to Mem. in Supp.) The reimbursement rate in the RxSolutions contract was substantially lower than the rates Omnicare negotiated with other national PDPs, including UnitedHealth—in fact, UnitedHealth's discount off of AWP in the WHI contract was only 75% of the discount provided in the RxSolutions contract, and UnitedHealth also paid a larger dispensing fee. (Rubinfeld Decl. ¶¶ 11-12, Attach. to Mem. in Opp'n.) Still, at least three small local PDPs, representing less than 1% of Omnicare's January 2006 revenues, did negotiate lower rates than the RxSolutions contract

contained. (*Id.*) As described above, Bien had directly asked Stephens whether PacifiCare would become a party to UnitedHealth's contract as a result of the merger. Yet Omnicare negotiators apparently did not consider the flip side of that question, and the contract contained no provision that precluded UnitedHealth from participating, after the merger, in the agreement that RxSolutions negotiated on behalf of PacifiCare.

## C. UnitedHealth Joins RxSolutions-Omnicare Agreement

Omnicare contends in this lawsuit that UnitedHealth's decision in February 2006 to withdraw from the WHI-Omnicare Agreement and join the RxSolutions contract had been planned by UnitedHealth and PacifiCare for a long period of time before the merger was finalized. Omnicare claims that UnitedHealth's basic strategy is summed up in a document referred to as the "stalking horse memorandum," first circulated between UnitedHealth and PacifiCare officials on September 6, 2005.[10] The two-page memo is titled "UnitedHealth Group's Pharmacy Management Options." (Ex. 215 to Mem. in Opp'n, at UN034675.) Page 1 discusses UnitedHealth's past experiences with PBMs and presents some basic information about RxSolutions, including the fact that it operates solely as an "in-house" PBM for PacifiCare and a description of the services RxSolutions provides. (*Id.*) The top of page 2 reads, in bold, "Several strategic options need to be considered to capitalize on the value proposition Prescription Solutions can bring to United." (*Id.* at UN034676.) The memo

---

[10] Several separate e-mails attached to Omnicare's brief contain copies of this memorandum. (*E.g.* Ex. 25; Ex. 44; Ex. 45; Ex. 211; Ex. 215; Ex. 216.) The basic document is the same in each exhibit, although some differences, including the precise placement of the "stalking horse" language, do appear. However, neither party appears to consider those differences material, and the court agrees that no substantive changes altered the meaning of this memorandum in any of the exhibits provided by Omnicare. (*See* Quam Dep. 207:16-21, Ex. 8 to Mem. in Opp'n (witness had same understanding of "stalking horse" language when it was repositioned in the memorandum).)

None of these copies clearly state who originally authored the memorandum, but it circulated among several officials responsible for pharmacy network management at the two entities, including Lois Quam and Peggy Olson at UnitedHealth; Howard Phanstiel, CEO of PacifiCare; and Jacqueline Kosecoff, an Executive Vice President at PacifiCare. (Exs. 44, 45 to Mem. in Opp'n.)

then lists three strategic options: "1. Continue to outsource all of United's PBM services . . . . 2. Adopt a mixed strategy of outsourcing selected PBM services/functions to external vendors and in source [sic] selected services/functions to Prescription Solutions . . . . 3. Eventually consolidate all PBM services internally under Prescription Solutions." (*Id.*) Under the second option, the memorandum asked, "Is there a role for a central group to manage all PBM services for United whether they are in-sourced or out-sourced to obtain the best financial terms, contracts and service?", and suggested as a solution, "Use Prescription Solutions as a stalking horse to obtain the best service and contracts." (*Id.*) Omnicare contends that this reference to using RxSolutions as a stalking horse demonstrates UnitedHealth's intention to "surreptitiously obtain more favorable contracts for [UnitedHealth] from vendors such as Omnicare." (Mem. in Opp'n at 21.)

UnitedHealth has a different explanation for its eventual withdrawal from the WHI-Omnicare Agreement. According to Defendants, UnitedHealth began harboring legal concerns about the WHI-Omnicare Agreement in general, and the 18 Patient Protections in particular, as early as August 2005. (Defs.' 56.1 ¶¶ 117-18.) Indeed, on September 12, two months before negotiations between Omnicare and PacifiCare resumed, Tobin sent Stephens an e-mail saying that UnitedHealth "may be requiring WHI to renegotiate our Omnicare agreement." (*Id.* ¶ 119.) On November 9, Attorney Infante warned that there were legal problems with the WHI Agreement (as noted, Omnicare questions whether this decision was reached independently). (*Id.* ¶ 121.) Around this same time, WHI's own senior attorney, Kelly Simenson, also concluded that the WHI-Omnicare Agreement, at least as it concerns UnitedHealth, conflicted with Medicare Part D regulations.[11] (*Id.*

---

[11] It is not altogether clear whether other PDP sponsors covered by the terms of the WHI-Omnicare Agreement also had concerns that the Agreement was inconsistent with federal regulations. At her deposition, Simenson expressed no opinion as to whether the WHI-Omnicare Agreement was noncompliant with Medicare regulations as to other PDP sponsors covered by the Agreement, but stated that part of the problem as it specifically related to UnitedHealth was that the Agreement allowed for more expansive benefit design than UnitedHealth's own policies did. (Simenson Dep. 44:3-16, App.135 to Mem. in Supp.) Even after UnitedHealth was dropped from
(continued...)

¶ 124.)  On December 8, two days after Omnicare signed the RxSolutions contract, UnitedHealth expressed its concerns about the WHI Agreement to Omnicare, apparently for the first time.  (*Id.* ¶ 125.)  Later that month, WHI forwarded a copy of the WHI-Omnicare Agreement to Omnicare, with proposed changes that WHI contended were necessary to bring the agreement into compliance with federal law and regulations.  (*Id.* ¶ 126.)  Omnicare concedes that "one or two" other unnamed PDPs raised legal concerns about the Patient Protections, and that several PDPs—including MedImpact, Caremark, RxAmerica, Coventry, FirstHealth, and Independent Health—signed contracts with Omnicare that did not contain the Protections.  (Omnicare's Resp. to Defs.' 56.1 ¶ 131.)  Bien believed that these objections regarding the Protections, including the claim that the Protections violated CMS regulations, were simply a negotiating tactic.  (*Id.*)  In early January 2006, UnitedHealth's outside counsel proposed an agreement, without many of the Protections, to replace the agreement negotiated on UnitedHealth's behalf by WHI.  (Defs.' 56.1 ¶ 130.)

Defendants claim that UnitedHealth learned of the RxSolutions-Omnicare Agreement in January 2006.  (*Id.* ¶ 132.)  Omnicare contends that the evidence recited above—especially the stalking horse memorandum—demonstrates that UnitedHealth both knew of and devised strategy around the RxSolutions contract months before this time.  (Omnicare's Resp. to Defs.' 56.1 ¶ 132.)  Yet on January 11, 2006, Stephens at UnitedHealth e-mailed Giambrone, his counterpart at RxSolutions, asking, "Quick question—do you have a Part D network agreement with Omnicare for LTC pharmacy?"  (Defs.' 56.1 ¶ 132.)  Later that day, Giambrone affirmed that

---

[11](...continued)
the WHI-Omnicare Agreement, WHI continued to seek to make changes to that Agreement (presumably on behalf of other PDPs), although these changes appear to have been motivated by business reasons rather than concerns about illegality.  (Defs.' 56.1 ¶ 141.)  The WHI-Omnicare Agreement continued in effect with respect to the other PDPs covered by it until December 31, 2008, the end of the initial term originally contemplated in the Agreement.  (Ex. 19 to Mem. in Opp'n; Omnicare's Supplemental Statement of Undisputed Material Facts ¶ 39.)

RxSolutions/PacifiCare did have such an agreement: "Yes—Do you?" (*Id.*) Stephens responded twenty minutes later, "Yes—we do through WHI. Let's discuss on Friday." (*Id.*) According to Defendants, this correspondence marked the first time that UnitedHealth became aware of the RxSolutions contract with Omnicare. (*Id.*)

Following a meeting between Giambrone and Stephens on January 20, Stephens wrote an e-mail to Tobin exploring the possibility that UnitedHealth might benefit from PacifiCare's advantageous deal with Omnicare:

> I learned from Angelo [Giambrone of RxSolutions] yesterday that PHS has a favorable agreement in place with Omnicare. We need to understand if we can utilize the [RxSolutions] agreement for our business—this may offer a different approach we can take with Omnicare. Will you discuss/get copy from [PacifiCare's in-house counsel]?

(*Id.* ¶¶ 133-34.) In response, Tobin e-mailed PacifiCare's in-house counsel a couple of days later, requesting a copy of the RxSolutions-Omnicare Agreement. "Angelo suggested to Craig that it could be useful to us in finalizing our agreement with Omnicare or that we might even be able to use it," she wrote. (*Id.* ¶ 135.) On February 22, 2006, Stephens verbally informed Bien that UnitedHealth would be utilizing the RxSolutions contract, effective April 1, 2006; he confirmed this in writing on February 28. (*Id.* ¶ 137.)

## IV. Omnicare files suit

Omnicare filed this action against Defendants on May 18, 2006 in the U.S. District Court for the Eastern District of Kentucky, the site of Omnicare's corporate headquarters and many potential witnesses. (Mem. Op. and Order [45] at 6.) The Kentucky district court transferred the matter to this court, relying on a forum selection provision of the WHI-Omnicare Agreement that provided for Illinois courts to have exclusive jurisdiction over disputes "arising under or in connection with" the Agreement. (*Id.* at 3.) Omnicare claims that, prior to the merger, UnitedHealth and PacifiCare conspired to have PacifiCare obtain the lowest possible price from Omnicare and then switch UnitedHealth's plan over to the more favorable PacifiCare-Omnicare contract. In its First

Supplemental and Amended Complaint ("Complaint"), Omnicare alleges that Defendants violated the Sherman Act, as well as a parallel Kentucky antitrust statute, by "conspir[ing] to coordinate their negotiations with Omnicare in order to . . . fix and depress the prices paid by defendants to Omnicare for providing those services." (Am. Compl. ¶ 6.) Omnicare further alleges that Defendants conspired to defraud Omnicare, fraudulently misrepresented their intentions to Omnicare, and were unjustly enriched by their fraud.

Defendants moved to dismiss the antitrust claims in the Complaint for failure to state a claim on which relief can be granted. This court denied the motion on September 28, 2007, holding that Omnicare had "pleaded facts which plausibly suggest that the merger agreement constituted a contract, combination, or conspiracy between UnitedHealth and PacifiCare under section 1 of the Sherman Act." *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 524 F. Supp. 2d 1031, 1039 (N.D. Ill. 2007). The court further held that Omnicare had pleaded sufficient facts to satisfy the other elements of the antitrust claims, namely, that Defendants' conduct resulted in an unreasonable restraint of trade, that Omnicare was a proper plaintiff to bring the suit, and that Omnicare had suffered an injury recognized by antitrust laws. *Id.* at 1039-44.

On June 20, 2008, Defendants moved for summary judgment on all claims. On the same date, Omnicare filed a Motion for Partial Summary Judgment Pursuant to Rule 56 Or in the Alternative Motion to Strike, arguing that five affirmative defenses advanced by Defendants fail as a matter of law. The court addresses both summary judgment motions in this opinion.

## DISCUSSION

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Unlike a motion to dismiss, a motion for summary judgment requires the opposing party to present evidence "showing a genuine issue for trial." FED. R. CIV. P. 56(e). A genuine issue of material fact exists

where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court will draw all reasonable inferences from the evidence in favor of the nonmoving party, *id.* at 255, but the nonmoving party still bears the burden of establishing the existence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

**I.     Federal Antitrust Claim**

Section 1 of the Sherman Act is designed to prevent business entities from entering into collusive agreements. By its terms, section 1 prohibits "[e]very contract, combination . . . , or conspiracy, in restraint of trade." 15 U.S.C. § 1. In the usual case, a price-fixing conspiracy exists between sellers who agree to artificially set their prices above or below market prices. *See Int'l Outsourcing Servs., LLC v. Blistex, Inc.*, 420 F. Supp. 2d 860, 864 (N.D. Ill. 2006) (citing *Arizona v. Maricopa County Med. Soc.*, 457 U.S. 332, 348 (1982)). Illegal agreements may also be made between buyers who conspire to establish a price below market levels, a situation often referred to as a "buyers' cartel." *Int'l Outsourcing Servs.*, 420 F. Supp. 2d at 864. To establish a successful section 1 claim against a buyers' cartel, a plaintiff must prove: (1) the existence of a contract, combination, or conspiracy between buyers; (2) an unreasonable restraint of trade in the relevant market; and (3) an injury caused by the cartel. *See Denny's Marina v. Renfro Prods.*, 8 F.3d 1217, 1220 (7th Cir. 1993).

Defendants argue that Omnicare cannot establish the existence of a genuine issue of material fact supporting its claim that Defendants violated section 1 of the Sherman Act. *See* 15 U.S.C. § 1. Specifically, Defendants argue that Omnicare has not presented sufficient evidence to avoid summary judgment on each of the three elements of the claim outlined above. The court agrees with Defendants that Omnicare has not established a genuine issue of material fact that the Defendants engaged in a contract, combination, or conspiracy in restraint of trade. Although the parties also devoted substantial briefing to the other two elements, the failure to establish a genuine

issue on the first element is dispositive of the entire claim, and the court therefore does not consider whether a genuine issue of material fact exists concerning an unreasonable restraint of trade or whether Omnicare was injured as a result of anticompetitive behavior.

Omnicare can prove the existence of an agreement through direct or circumstantial evidence. *Miles Distribs., Inc. v. Specialty Constr. Brands, Inc.*, 476 F.3d 442, 449 (7th Cir. 2007). Direct evidence is "evidence tantamount to an acknowledgment of guilt," while circumstantial evidence is "everything else including ambiguous statements." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002). When relying on circumstantial evidence to establish the existence of a conspiracy, at least some of the evidence "must tend to exclude the possibility that the alleged conspirators acted independently rather than in concert." *Miles Distribs.*, 476 F.3d at 449 (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). This standard does not, however, require the plaintiff to exclude any possibility that the defendants acted independently. *See In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 787 (7th Cir. 1999). Rather, the standard merely establishes that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita*, 475 U.S. at 588 (citing *Monsanto*, 465 U.S. at 764). Therefore, while the plaintiff in an antitrust case faces no higher burden to defeat summary judgment than a plaintiff in another case, *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 468 (1992), antitrust law does "limit[] the range of permissible inferences from ambiguous evidence in a [section] 1 case." *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 660 (7th Cir. Ill. 1987) (quoting *Matsushita*, 475 U.S. at 588).

Omnicare argues that the voluminous evidence presented with this motion creates a genuine issue of material fact as to the existence of an illegal agreement between UnitedHealth and PacifiCare. First, Omnicare argues that the Merger Agreement between UnitedHealth and PacifiCare by its own terms establishes the existence of a conspiracy in restraint of trade. Second,

Omnicare claims that PacifiCare's actions in its contract negotiations with Omnicare were economically irrational unless understood as the product of concerted action with UnitedHealth. Omnicare's final argument is that the information exchanged by the merging entities in the period leading up to the merger was competitively sensitive and creates substantial evidence from which a jury could find the existence of a conspiracy.

For the reasons explained here, the court concludes that the evidence on which Omnicare relies is at least as consistent with independent action by the Defendants as it is with an unlawful agreement. Accordingly, Defendants are entitled to summary judgment on Count I.

### A.    Merger Agreement

The main pillar of Omnicare's proof of a contract, combination, or conspiracy is the Merger Agreement signed by PacifiCare and UnitedHealth. In denying Defendants' motion to dismiss, this court held that "Omnicare has pleaded facts which plausibly suggest that the merger agreement constituted a contract, combination, or conspiracy between UnitedHealth and PacifiCare under section 1 of the Sherman Act." *Omnicare, Inc.*, 524 F. Supp. 2d at 1039. At the summary judgment stage, however, merely pleading sufficient facts will not suffice to withstand a motion for summary judgment; rather, the plaintiff must make an affirmative showing of proof that a genuine issue of material fact exists that requires a trial. *See Ruffin-Thompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005) (citing *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988)). An examination of the Merger Agreement itself—including the materials incorporated by reference into the agreement—shows that Omnicare has not made such a showing here.

Omnicare emphasizes a provision of the Merger Agreement (the "approval provision") that requires PacifiCare to obtain UnitedHealth's approval for any transaction, other than those entered into in the ordinary course of business, in excess of $3 million. Specifically, section 5.01 of the Merger Agreement prohibits PacifiCare from "enter[ing] into . . . any Contract . . . that involves [PacifiCare] or any of its Subsidiaries incurring a liability in excess of three million dollars." (Merger

Agreement § 5.01(a)(x), Ex. 72 to Mem. in Opp'n.)  In Omnicare's view, the approval provision sets

such a low threshold that it essentially grants UnitedHealth control over all of PacifiCare's Part D

contracts.  In response, Defendants point to exceptions in the Merger Agreement that carve out the

Part D contract entered into by RxSolutions from the approval requirement.  Most notably,

Defendants point to the Company Disclosure Letter ("Letter") referred to in section 5.01 of the

Merger Agreement.  Section 5.01 establishes the $3 million ceiling for PacifiCare transactions that

do not require UnitedHealth approval, except as "provided in Section 5.01(a) of the Company

Disclosure Letter."  (*Id.*)  That Letter specifically authorizes PacifiCare "and its Subsidiaries [to]

enter into or amend any Contracts relating to their Part D standalone business . . . ."  (Company

Disclosure Letter § 5.01(a)(1), Ex. 73 to Mem. in Opp'n.)  Omnicare has not challenged Defendants'

interpretation of the provision: that it exempts PacifiCare from securing UnitedHealth's approval

before entering into a Part D contract.  Instead, Omnicare casts doubt on the Letter's authenticity,

arguing that it is only a draft, and characterizes Defendants' tardy disclosure of the Letter as an

"affront to this court."  (Mem. in Opp'n at 37.)  None of these reasons provide a basis on which the

court is free disregard the letter.

Authentication of a document can be made by a "witness with knowledge" who testifies "that

a matter is what it is claimed to be."  FED. R. EVID. 901(b)(1).  PacifiCare's Chief Executive Officer

and President at the time of the merger, Howard Phanstiel, confirmed the parties' interpretation of

the Letter, testifying that he "understood that Part D contracts with providers, like institutional

pharmacy provider Omnicare, Inc., were exempted" from the approval provision by the Company

Disclosure Letter.  (Phanstiel Decl. ¶¶ 4-5, App. 47 to Mem. in Supp.)  Phanstiel further asserted

that the Letter attached to his Declaration was a "true and correct copy" of the Letter, which

sufficiently authenticates the Letter under Rule 901(b)(1).  (*Id.* ¶ 5.)  Contrary to Omnicare's

suggestion, the copy of the Letter attached to Phanstiel's Declaration is not labeled as a "draft," and

Omnicare has presented no other basis for the conclusion that it was not a binding part of the

PacifiCare/UnitedHealth Merger Agreement.  Omnicare's suggestion that the court should disregard the Letter because it is unexecuted is insufficient in this regard: the Letter is not a separate agreement that required separate execution by the parties, but rather is incorporated by reference into the Merger Agreement based on the explicit reference in § 5.01 of the Agreement.  Finally, Omnicare argues that the Defendants' production of the Letter at this late stage in the proceedings, two years after the action was initially filed, is an "affront to the court." (Mem. in Opp'n at 37.)  The court is also puzzled by Defendants' regrettable decision to withhold materially beneficial evidence until the summary judgment stage.  Nonetheless, nothing in the record casts serious doubt upon the authenticity of the Letter, and the court will not exclude relevant evidence solely on the basis of effrontery.

Finding no basis on which to exclude the Company Disclosure Letter, the court must consider it in determining whether a genuine issue exists as to the existence of a conspiracy based on the Merger Agreement.  In ruling on the motion to dismiss, the court concluded that the allegation that Defendants "coordinated their decisions regarding PacifiCare's entry into new agreements" was sufficient to state a claim.  *Omnicare*, 524 F. Supp. 2d at 1037.  Now at the summary judgment stage, Omnicare bears the burden of showing that a genuine issue exists as to whether such coordination actually took place.  The Company Disclosure Letter explicitly excludes PacifiCare's Part D negotiations from requiring UnitedHealth's approval, and Phanstiel stated that, to the best of his knowledge, "PacifiCare did not ask for United's prior consent to enter into any pharmacy-network contract with Omnicare or any other pharmacy provider." (Phanstiel Decl. ¶ 7, App. 47 to Mem. in Supp.)  All that Omnicare offers in rebuttal is the text of § 5.01 of the Merger Agreement, but as noted above, the relevance of that text is undermined by the Company Disclosure Letter.

Omnicare also relies on two consent decrees that the United States entered into with companies accused of violating the Sherman Act to argue that the UnitedHealth-PacifiCare Merger

Agreement is anticompetitive. According to Omnicare, the merger agreements in both cases contain similarly restrictive provisions, which DOJ relied upon in determining the existence of a conspiracy in restraint of trade. As an initial matter, the court notes that these decrees have no precedential value. More importantly, the provisions of the merger agreements involved in those other cases are clearly distinct from the approval provision of the UnitedHealth/PacifiCare agreement. The provision in the Merger Agreement between UnitedHealth and PacifiCare is a relatively common feature in merger agreements intended to insure that the acquired company (PacifiCare) does not assume any major liabilities for which the acquiring company (UnitedHealth) would be responsible after the merger. *See* Antitrust Adviser, *supra* § 3:74, at 3-270. By contrast, the merger agreement in *United States v. Computer Assocs. Int'l, Inc.*, No. 01-02062, 2002 WL 31961456 (D.D.C. Nov. 20, 2002), contained a provision preventing the acquired company from setting prices below a certain level. *Id.* at *9. This provision could not be explained in terms of its possible effect on the proposed merger and appeared to be motivated almost entirely by anticompetitive interests. *Id.* (provision is "extraordinary and not reasonably ancillary to any legitimate goal of the transaction").

Nor does *United States v. Gemstar-TV Guide Int'l, Inc.*, No. 03-0198, 2003 WL 21799949 (D.D.C. July 11, 2003) establish that the UnitedHealth/PacifiCare agreement violates the Sherman Act. In fact, in the *Gemstar* case, DOJ explicitly sanctioned the use of terms that limit the acquirer's liability. *Id.* at *3 (permitting merging parties to agree to "forego conduct that would cause a material adverse change in the value of to-be-acquired assets during the Pre-consummation Period"). As numerous commentators, including Omnicare's expert and the general counsel of the Federal Trade Commission, have noted, these approval provisions are common practice in mergers, and the presence of one here does not constitute evidence of conspiracy. (Coates Report ¶ 68, Attach. to Mem. in Opp'n; William Blumenthal, *The Scope of Permissible Coordination Between Merging Entities Prior to Consummation*, 63 Antitrust L.J. 1, 55-56 (Fall 1994).) In the

absence of other evidence of a conspiracy, the threshold value of $3 million is not so low as to give rise to an inference of conspiracy.

In sum, the Merger Agreement by its own terms did not require UnitedHealth to approve PacifiCare's Part D contracts.[12] The commonly-adopted provision requiring the acquirer's approval of certain transactions therefore cannot provide the basis to conclude that a conspiracy in restraint of trade existed.

### B.    Economic Evidence

Omnicare next contends that economic evidence demonstrates that Defendants must have entered into an illegal agreement in restraint of trade.    Generally, courts will not second-guess business judgments made by a private actor.    *See Lamb's Patio Theatre, Inc. v. Universal Film Exchanges, Inc.*, 582 F.2d 1068, 1070 (7th Cir. 1978).    Some courts have, however, recognized that evidence that a defendant's action, if taken independently, would be contrary to its economic self-interest "tend[s] to exclude the likelihood of independent conduct" and may therefore constitute circumstantial evidence in support of a Sherman Act claim sufficient to survive summary judgment. *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999).    Omnicare argues that PacifiCare's bargaining strategy makes no sense in the absence of a conspiracy because a contract with Omnicare was the only practical way for PacifiCare to provide drugs to many of its enrollees in LTC facilities serviced by Omnicare.    If PacifiCare had not reached a secret agreement with UnitedHealth, Omnicare concludes, its bargaining behavior was so reckless that it endangered PacifiCare's reputation, its Part D certification by CMS, and even the merger itself.    Omnicare also claims that the reimbursement rate it received in the PacifiCare contract is itself evidence of a conspiracy because it was significantly lower than prevailing market rates and could only have been

---

[12]    The clear and unequivocal language of the Company Disclosure Letter makes it unnecessary to consider Defendants' arguments that two other provisions of the Merger Agreement demonstrate that the approval provision does not apply to PacifiCare's Part D contract with Omnicare.

extracted from Omnicare by anticompetitive behavior.  The court addresses these arguments in turn.

<h2 style="text-align:center">1.    PacifiCare's Bargaining Strategy</h2>

In mid-July 2005, PacifiCare had not yet been approved by CMS as a national PDP.  Given Omnicare's widely-felt presence in the market, Omnicare argues that PacifiCare's decision to break off negotiations at that point in the CMS-approval process was reckless and made no economic sense.  First, Omnicare argues that the decision risked PacifiCare's ability to get drugs to its enrollees living in nursing homes serviced by Omnicare, which would seriously harm PacifiCare's brand name with senior citizens.   Second, the decision to break off negotiations also put PacifiCare's certification with CMS at risk.  On March 16, 2005, CMS had explicitly told PacifiCare, "We would expect that the plan would seek to enter into a network contract with a pharmacy serving the LTC facility as soon as practicable."  (3/16/05 Long-Term Care Guidance, Ex. 20 to Mem in Opp'n at 4.)  According to Omnicare, by breaking off negotiations with the institutional pharmacy that was likely to service many of PacifiCare's dual eligibles and that possessed exclusive contracts with many of the LTC facilities, PacifiCare jeopardized its CMS certification and risked the loss of $64 million in Part D profits PacifiCare was expecting in 2006.   Finally, Omnicare suggests that PacifiCare's economically-irrational decision to break off negotiations with Omnicare may even have put PacifiCare's planned merger with UnitedHealth at risk, if UnitedHealth thought the loss of the expected PDP profits made the merger no longer desirable.[13]  Based on information available in PacifiCare's public financial statements, Omnicare argues that PacifiCare's strategy put at risk $64 million in Part D profits, a gain in its market capitalization of $1.2 billion, $243 million in merger-related costs that PacifiCare would have to realize as losses (for tax purposes) had the merger failed, and $60 million in executive bonuses to be paid upon completion of the merger; in exchange,

---

[13]    Omnicare has not provided any evidence that UnitedHealth in fact would have backed out of the merger if CMS did not certify PacifiCare's PDP.

PacifiCare stood to gain only $11 million based on better reimbursement rates in the Omnicare contract over three years. (Coates Decl. ¶5, Rubinfeld Decl. ¶ 9, Attachs. to Mem. in Opp'n.) And, if UnitedHealth were to become a party to the RxSolutions contract, the newly-merged entity stood to gain somewhere between $130 and $300 million. These circumstances, according to Omnicare, create a genuine issue of material fact as the economic reasonableness of PacifiCare's decisions.

In defense of its business judgment, PacifiCare relies principally on the fact that its strategy succeeded—PacifiCare's PDP was certified by CMS without Omnicare and it eventually received a lower rate in its contract with Omnicare. This fact by itself, according to PacifiCare, undermines any challenge to its decision and defeats the contention that PacifiCare's decision to call Omnicare's bluff is inconsistent with independent action on the part of PacifiCare. The court agrees that the success of PacifiCare's strategy entitles it to very strong judicial deference, for if business judgments generally deserve deference, *see Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1223 (7th Cir. 1982), then successful business judgments deserve even greater deference.

In fact, the record shows that PacifiCare's business strategy made sense even without the benefit of hindsight. At the time PacifiCare refused to sign the Omnicare contract and insisted on working from the RxSolutions standard contract, there were several other PDPs—including at least one other national PDP—that also refused to sign Omnicare's contract before the CMS bid deadline of August 1. In August 2005, CMS informed PacifiCare that its LTC pharmacy network was deficient and that PacifiCare needed to expand its network by contracting with additional pharmacies. Rather than returning to Omnicare, with whom PacifiCare believed there were a number of outstanding issues, PacifiCare thought it could sufficiently patch its pharmacy network by contracting with MHA. CMS ultimately approved PacifiCare's PDP with MHA, and not Omnicare, in its network. Similarly, Humana, another national PDP, contracted with enough other pharmacies to meet the CMS requirements without Omnicare in its network.

Omnicare believes its own centrality to a national PDP's LTC strategy make PacifiCare's

insistence upon using its own form contract, initially at the expense of any agreement with Omnicare, irrational and thereby creates a genuine issue of material fact concerning the reasonableness of the strategy. The record undermines this assertion, as well. Omnicare's bargaining power with other PDPs in addition to PacifiCare was apparently greatly reduced as 2005 wore on; the reasonableness of PacifiCare's decision to use the RxSolutions contract is demonstrated by the fact that so many other PDPs insisted upon their own contracts that Tim Bien of Omnicare conceded that it "was the standard practice for PBMs" to insist on the PBM's own form contract. Fully 15 out of Omnicare's 21 contracts entered into between August 1, 2005 and April 1, 2006 used the PDP's form contracts, rather than the version proposed by Omnicare.[14] (Defs.' 56.1 ¶¶ 43, 45.) The record indicates that Omnicare simply was not as essential to CMS approval as it argues it should have been.

It appears from the record that CMS's approval of PacifiCare's PDP without Omnicare so strengthened PacifiCare's bargaining position that it was justified in again demanding that Omnicare sign PacifiCare's own "Any Willing Provider" contract. In early November, CMS distributed a document intended for PDPs that had already been certified, cautioning that "in order to facilitate plan compliance with the LTC convenient access standard, we strongly encourage plans to contract with LTC pharmacies serving all the LTC facilities in which their enrollees might reside as soon as practicable." (LTC Convenient Access Standard Statement at 1, Ex. 89 to Mem. in Opp'n.) One would expect this directive to entice PacifiCare to resume negotiations with Omnicare, but to suggest, as Omnicare does, that it substantially increased Omnicare's bargaining position is unjustified—if it had, one would expect that PacifiCare would have been eager to sign Omnicare's form contract rather than the other way around. Within one month of the CMS directive, PacifiCare

_____

[14] According to Bien, Omnicare's "shift in thinking" in agreeing to PDP form contracts after August 1 was caused by Omnicare's desire to protect its patients' interests by ensuring they would be covered under Part D, and not the result of a reduction in Omnicare's bargaining power. (Omnicare's Resp. to Defs.' 56.1 ¶ 82; Bien Dep. 127:12-128:4, Ex. 79 to Mem. in Opp'n.)

did enter into a contract with Omnicare, and it did so from a superior bargaining position as a large CMS-certified PDP. Perhaps as a result, the reimbursement rates in that contract were substantially more favorable to PacifiCare than the rates PacifiCare and Omnicare had discussed earlier. In short, the contract that Omnicare signed—without making a counteroffer—was undisputedly favorable to PacifiCare and undermines Omnicare's assertion that Omnicare was in the stronger bargaining position.

At its core, Omnicare's theory would require the court to hold that a bargaining strategy that was ultimately successful and saved PacifiCare money was nevertheless illogical and contrary to its economic interest. It may not be impossible for a plaintiff to argue that a successful business strategy was economically irrational, but such an argument requires, at a minimum, a stronger showing than was made here, where PacifiCare demonstrated a rational basis for its actions and showed that other PDPs acted similarly. Granting due deference to the business decisions of PacifiCare, the court cannot conclude that its successful bargaining strategy was so irrational that it was inconsistent with independent action.

### 2. Reimbursement Rate

Omnicare next contends that the reimbursement rate provided in the Omnicare-RxSolutions contract was so low as to be proof of a conspiracy. Information about uncompetitive prices may be probative evidence suggesting the existence of a conspiracy. *See JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 778-79 (7th Cir. 1999). Omnicare has provided an expert's report concluding that the reimbursement rate paid by PacifiCare under the RxSolutions contract was significantly lower than other national PDP's rates paid to Omnicare. According to Omnicare, PacifiCare's ability "to extract a lower reimbursement rate from Omnicare than other PDPs that were more than five times [PacifiCare's] size simply makes no economic sense." (Mem. in Opp'n at 56-57.)

If PacifiCare was indeed successful in negotiating an unusually favorable rate, Omnicare

has failed to produce any evidence that suggests this was a result of anything other than unsuccessful bargaining on Omnicare's part. When negotiations between PacifiCare and Omnicare resumed in November 2005, PacifiCare demanded that further negotiations take place on the basis of the RxSolutions contract, and sent Omnicare a copy. Rather than suggest any changes to the contract or the reimbursement rate, Omnicare signed the copy without negotiation. If PacifiCare's proposed lower rate had been problematic or unconscionable, one would expect Omnicare to protest or at least make a counterproposal. The record contains no indication that the rate was non-negotiable or that Omnicare otherwise felt some economic coercion to enter into the contract. Omnicare's characterization of the lower reimbursement rate as being "extracted" from Omnicare is inconsistent with evidence that the contract was willingly entered into by two sophisticated parties. Moreover, the rate at issue, while lower than the rates offered by other national PDPs, was higher than the rates Omnicare had agreed to with three local PDPs. These local PDPs admittedly made up a small portion of Omnicare's business, but the existence of these contracts—as well as Omnicare's silence regarding the rate—defeats the inference that PacifiCare's rate was so low as to be suspect on its face. If the contract really made no economic sense, as Omnicare now contends, one would not have expected Omnicare to enter into that contract so readily; even given Bien's stated concern that he was worried about Omnicare's ability to provide coverage to PacifiCare enrollees, some bargaining on price and other terms would still be expected. Far from being inconsistent with independent action, this evidence is entirely consistent with one company's finding itself in a superior bargaining position *vis a vis* a supplier and offering a contract to the supplier on terms favorable to itself. Therefore, nothing in the reimbursement rate paid by PacifiCare constitutes evidence of a conspiracy.

## C. Premerger Communications and Information Exchange

Finally, Omnicare argues that communications that took place between UnitedHealth and PacifiCare prior to the completion of the merger on December 20, 2005 create a genuine issue as

to the existence of a conspiracy.  Omnicare asserts that this evidence is all direct evidence; in fact, the court sees none of it as "tantamount to an acknowledgment of guilt."  Because the evidence requires the drawing of inferences to find the existence of a conspiracy, that evidence is actually circumstantial and must be considered under the *Monsanto/Matsushita* framework.  *High Fructose Corn Syrup*, 295 F.3d at 662.  Accordingly, Omnicare must again offer at least some evidence that "tends to exclude the possibility of independent action."  *Monsanto*, 465 U.S. at 768.

At the outset, the court notes that virtually no case law establishes standards for determining when premerger discussions are anticompetitive.  Some federal agencies have, however, expressed concern about the potential anticompetitive effects of premerger communications and coordination.  *Accord* ANTITRUST ADVISER, *supra* § 3:74, at 3-271.  DOJ and the Federal Trade Commission ("FTC") have entered into a handful of consent decrees with companies who illegally coordinated premerger activities; but these cases are not very instructive because they did not all concern alleged Sherman Act violations, and furthermore, were all "easy cases that involved egregious conduct."  William Blumenthal, General Counsel, FTC, The Rhetoric of Gun-Jumping, Remarks Before the Association of Corporate Counsel, Annual Antitrust Seminar of the Greater New York Chapter (Nov. 10, 2005), at 2-3, available at http://www.ftc.gov/speeches/ 05speech.shtm.  The balance the court seeks to strike here is a sensitive one.  On the one hand, courts should not allow plaintiffs to pursue Sherman Act claims merely because conversations concerning business took place between competitors during merger talks; such a standard could chill business activity by companies that would merge but for a concern over potential litigation.  On the other hand, the mere possibility of a merger cannot permit business rivals to freely exchange competitively sensitive information.  This  standard could lead to "sham" merger negotiations, or at least allow for periods of cartel behavior when, as here, there is a substantial period of time between the signing of the merger agreement and the closing of the deal.  With this delicate balance, as well as the *Monsanto/Matsushita* framework, in mind, the court considers the evidence

offered by Omnicare of premerger information exchange.

### 1. Late June/Early July 2005

As detailed above, UnitedHealth and PacifiCare first began discussions of a possible merger in January 2005, but talks between the two entities intensified in the weeks leading up to the signing of the Merger Agreement on July 6. In a series of meetings in June and July, the two parties exchanged strategic information, including Part D average pricing. Defendants emphasize that the information exchange took place between senior members of the merging entities, referred only to averages and ranges, did not mention the prices offered to Omnicare, and virtually never discussed long-term care networks or the contract terms offered to LTC pharmacies.

Omnicare disputes these characterizations of the talks. First, Omnicare disputes that these talks were exclusively among high-level officials of PacifiCare and UnitedHealth. This factor is relevant because high-level executives are less likely to be directly involved in developing the Part D proposals and less directly able to use any of the competitively sensitive information, to the extent such information was disclosed. Omnicare claims that "business operations employees" were involved in the June due diligence meetings. (Omnicare's Resp. to Defs.' 56.1 ¶ 23.) Omnicare fails to define what exactly it means by "business operations employees," however, and a review of the attendees at the June due diligence meetings, listed above in the Statement of Facts, shows that it was attended primarily by CEOs, CFOs, and other senior executives of various UnitedHealth and PacifiCare business segments. (Due Diligence Summary–Point Part D, Ex. 38 to Mem. in Opp'n.) That these officials may have overseen aspects of Part D can hardly be surprising; indeed, it would be stranger if the executives at the Part D due diligence meetings had little or no connection to the Part D business. In addition, the UnitedHealth, PacifiCare, and RxSolutions officials who appeared to have the most direct contact with Omnicare—such as Rochele Cortes at RxSolutions or Craig Stephens at UnitedHealth—do not appear to have been present at these meetings. The blanket usage of the term "business operations employees" therefore has no

34

bearing on whether UnitedHealth and PacifiCare officials improperly exchanged information during due diligence.

Even if those directly involved with negotiations with Omnicare and other pharmacies were not those directly involved in the due diligence meetings, Omnicare has demonstrated the existence of a genuine issue of material fact as to whether such personnel were provided with information in excess of what was permitted by the confidentiality agreements. A UnitedHealth official on the due diligence team, Jerry Knutson, testified that other UnitedHealth personnel not on the team were consulted about matters learned in due diligence. (Knutson Dep. 85:21-86:11, Ex. 32 to Mem. in Opp'n.) Knutson explained that these consultations were essential for the due diligence team to assess the relevance of the information the team was receiving. (*Id.* at 86:15-22.) The consultations nevertheless do create concerns that competitively sensitive information was leaked outside of the parameters set by the confidentiality agreement covering such information. Defendants deny having employed the information for any improper purposes, but, though Knutson's reasons for sharing the information may be benign, the risk remains that these officials could have used the information they obtained in anticompetitive ways to benefit their own businesses. Omnicare has thus established a genuine issue of material fact as to whether Plan D decision makers were involved in these discussions. Coupled with other evidence of improprieties during merger negotiations, this evidence might well be inconsistent with independent action. By itself, however, this issue does not support an inference of conspiracy because it is not inconsistent with the belief that the two entities were still acting independently.

Omnicare's other suggestions of impropriety are less convincing. Omnicare observes that during the course of due diligence, UnitedHealth was shown a PacifiCare document entitled "Form of Prescription Drug Services Agreement," which was also the title of the "Any Willing Provider" contract that RxSolutions ultimately signed with Omnicare. This contract template is not specific to Part D contracts, however, and, by itself, does not create a binding contract to provide LTC care

under Part D.  (Lagerstrom Decl. ¶ 3, App. 206 to Defs.' Reply.)  Nor does the PacifiCare form contain any Part D pricing information or make any reference to Omnicare or any other specific institutional pharmacy.  (*Id.*)  The fact that it is substantially the same form as the contract that Omnicare later signed is thus of little significance, because nothing in this document communicates anything about prices that PacifiCare was offering to LTC providers or other pharmacies under Part D.  All that it shows is that RxSolutions possessed in June, and in fact used in December, a generic template to enter into an agreement with an institutional pharmacy.  This fact is simply immaterial to this summary judgment motion.

Omnicare also points to the price information that was exchanged during the due diligence process as further evidence of anticompetitive behavior.  Specifically, the Part D questionnaire that UnitedHealth sent PacifiCare asked for PacifiCare's expected average brand discount off of AWP.  PacifiCare replied that the rate was AWP - [x]% for its Preferred Network, which was in fact the same rate that PacifiCare ultimately paid in the Omnicare contract.  Omnicare does not argue that this price information was irrelevant to UnitedHealth's determination of an appropriate offer price for the merger, and the court agrees that the information had some importance to consummating the Merger Agreement.  UnitedHealth's method of obtaining the admittedly relevant information appears to the court to be appropriately circumspect—rather than requesting all information about all relevant markets, UnitedHealth asked only for averages and ranges.  Nor can Omnicare properly dispute the assertion of Ken Lagerstrom, head of UnitedHealth's Corporate Development, that "no Part D information that was available to us . . . relate[d] to specific contracts."  (Lagerstrom Dep. 393:24-394:2, App. 22 to Mem. in Supp.)  Omnicare claims that UnitedHealth's access to PacifiCare's "Any Willing Provider" contract undercuts this claim, but as noted above, that form is a contract template that does not provide specifics and Omnicare has not established any genuine issue as to the materiality of that form.

The natural question arising from this information exchange is, was this information

exchange necessary for the due diligence process?  *See* Michael C. Naughton, *Gun-Jumping and Premerger Information Exchange: Counseling the Harder Questions*, 20-SUM ANTITRUST 66, 68 (Summer 2006).  Certainly, one could not expect that the two merging entities would not discuss Part D plans at all, so the exchange of some information relating to Part D does not automatically create a genuine issue as to the existence of a conspiracy.  And, as discussed above, the pricing information that was exchanged—arguably the most competitively sensitive of any of the exchanged information—was provided late in the process (less than one month before the signing of the Merger Agreement) and was conveyed in the form of averages and ranges rather than specific bargained-for rates.  In early June 2005, UnitedHealth officials were even complaining about the difficulty of assessing PacifiCare's "level of readiness to implement the Part D business and the level of business risk they are assuming."  (Paul Memo at 2, App. 29 to Mem. in Supp.) Omnicare has failed to establish that the price and strategy information that was subsequently exchanged creates a genuine issue as to the existence of a conspiracy.  Rather, the evidence suggests that the information exchange was as general as possible to enable UnitedHealth to evaluate PacifiCare's Part D readiness and its level of business risk.  Even though it appears that UnitedHealth did not scrupulously enforce the segregation of its due diligence team from other members, that fact alone cannot alter the generally benign nature of the information exchanged. From the record, it appears that this exchange of information was necessary to due diligence and was performed in a reasonably sensitive manner.

Three additional pieces of evidence warrant further discussion.  First, UnitedHealth's sharing of its own average price information with PacifiCare could be seen as unnecessary and circumstantial evidence of a conspiracy.  Some commentators argue that the inference of a conspiracy is significantly weakened where it is the target (here, PacifiCare) who is providing information to the acquirer.  *See* Blumenthal, *The Scope of Permissible Coordination Between Merging Entities Prior to Consummation*, *supra* at 5 (quoting a past general counsel of the FTC).

Although the vast majority of the UnitedHealth-PacifiCare information exchange falls into this category, UnitedHealth did provide PacifiCare with UnitedHealth's own average bid information on July 2. (Defs.' 56.1 ¶ 25.) The rationale for the acquiring corporation's providing price information—even average price information—to the acquired firm is weaker than for providing the target's information to the acquirer, but there is still a rational basis for it: just as the acquirer wants to know that it is not making a dangerous investment in acquiring the target, the target wants to have some assurance that the entity that is acquiring it is well-run and has a strong strategic vision for the future. *See generally* ANTITRUST ADVISER, *supra* 3:74, at 3-270. The other circumstances surrounding this information exchange also demonstrate its harmless nature. Peter Frank, an independent actuary hired by UnitedHealth, delivered the information to PacifiCare in a sealed envelope because the PacifiCare personnel with whom he was meeting had not disqualified themselves from PacifiCare's negotiations with CMS. As a precautionary measure, Frank had disqualified himself from participating in UnitedHealth's negotiations with CMS due to his receipt of PacifiCare's average bid information.[15] (Frank Dep. 127:3-9, App. 21 to Mem. in Supp.) Frank's intent was that the sealed envelope be passed along to individuals who had disqualified themselves from CMS negotiations but could analyze UnitedHealth's Part D data in a manner that would aid them in their decisions concerning the merger. For unexplained reasons, the record does not disclose who at PacifiCare did view this information, but under *Matsushita*, this is not evidence inconsistent with competitive behavior and thus cannot be the basis for finding a genuine issue of material fact as to the existence of a conspiracy.

Significantly, in all this evidence of meetings concerning Part D plans, the record contains only one reference to any discussion specifically concerning Omnicare: PacifiCare's CEO testified to having a conversation with Jacqueline Kosecoff, Executive Vice President of PacifiCare's

---

[15]     At his deposition, Frank said that disqualification would have been unnecessary if he knew what PacifiCare was going to tell him. (Frank Dep. 127:15-23, App. 21 to Mem. in Supp.)

Specialty Companies, about PacifiCare's difficulty in negotiating a contract with Omnicare, and Kosecoff mentioned that UnitedHealth was also having difficulties. (Phanstiel Dep. 93:18-94:2, Ex. 29 to Mem. in Opp'n.) Even assuming Kosecoff learned this information from a conversation with a UnitedHealth official, her statement does not support an inference that UnitedHealth and PacifiCare were engaged in a price-fixing conspiracy. Nothing in the statement suggests that pricing or strategy regarding negotiations with Omnicare were discussed between PacifiCare and UnitedHealth. For this reason, Omnicare's reliance on *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 527 F. Supp. 2d 1257 (D. Kan. 2007) is misplaced. Summary judgment was denied in that case because the defendants "communicated to each other (i.e., to their competitors) about their strategies." *Id.* at 1304. Neither Kosecoff's statement about UnitedHealth nor any of the preceding evidence about conversations between UnitedHealth and PacifiCare suggests that any such strategic discussions took place in the pre-Merger Agreement discussions.

Finally, Omnicare argues that the Company Disclosure Letter actually supports the conclusion that section 5.01 of the Merger Agreement constitutes evidence of a conspiracy. According to Omnicare, UnitedHealth would only have agreed to this exception to the approval provision if PacifiCare had already disclosed its Part D contracting strategy to UnitedHealth. In support, Omnicare points to a statement made by Lagerstrom that UnitedHealth "got a confidence level that [PacifiCare] would not lose money in their Part D program" based on "pricing information" PacifiCare delivered to UnitedHealth during due diligence in the weeks leading up to the signing of the Merger Agreement. (Lagerstrom Dep. 442:22-443:13, Ex. 34 to Mem. in Opp'n.) For the reasons given above, however, the pricing information PacifiCare disclosed was not so competitively sensitive that it was inappropriate to disclose during the days leading up to the signing of the Merger Agreement. The exception for Part D plans written into the letter simply cannot be understood as consistent only with a finding of a conspiracy between UnitedHealth and PacifiCare.

### 2. Communications Subsequent to Execution of Merger Agreement

Following the signing of the Merger Agreement, the record contains virtually no reference to communications between UnitedHealth and PacifiCare relating to Part D pricing or strategy in general, or LTC contracts and Omnicare in particular. This silence is consistent with Defendants' denials of any concerted activity, particularly since both parties' contracts with Omnicare were entered into after the signing of the Merger Agreement. *See* Blumenthal, *The Scope of Permissible Coordination Between Merging Entities Prior to Consummation*, *supra* at 5 ("Once price is agreed upon . . . and an agreement to merge is reached, further information exchanges are more difficult to justify.") Omnicare makes much of the memorandum shared between high-level PacifiCare and UnitedHealth officials, suggesting that the combined postmerger entity use RxSolutions "as a stalking horse to obtain the best service and contracts." (UnitedHealth Group's Pharmacy Management Options, Ex. 215 to Mem. in Opp'n, at UN034676.) According to Omnicare, the "'stalking horse' memorandum" is an important exception to this lack of post-Merger Agreement communications and provides direct evidence of a conspiracy.[16]

Again, the stalking horse language is not an admission of guilt and is therefore not direct evidence of a conspiracy. The court must instead determine what value it has as circumstantial evidence of a conspiracy. The entire document is clearly written prospectively, with an eye towards integration of services after the merger is completed. The top of page 2, for instance, says that "several strategic options *need to be considered*," not that one strategic option is currently being

---

[16]      Omnicare also suggests that this strategy to impermissibly use RxSolutions was discussed at the June 28, 2005 due diligence meeting between UnitedHealth and PacifiCare. A memorandum prepared after the meeting shows that the parties discussed ways to combine resources, and UnitedHealth concluded that "[t]he combined entities would be advantaged through the . . . [c]onsolidation and leverage of resources in regard to Pharmacy benefit administration (PBMs) [and] Pharmacy Network contracting . . . ." (Due Diligence Summary–Point Part D, Ex. 38 to Mem. in Opp'n, at UN282570.) The court sees no impropriety in this comment. UnitedHealth was considering ways to achieve better economies of scale after the merger and suggested that the PBM area was one area where this was possible. Omnicare's argument that this memorandum provides direct or indirect evidence of a conspiracy is unpersuasive.

pursued. In fact, three separate strategic possibilities are listed: outsource all PBM services, outsource some PBM services, and outsource no PBM services. Only one of those options contains any reference to the stalking horse (and that reference is in a sub-sub-point), so it is difficult to conclude that one phrase in the middle of the document constitutes evidence of a conspiracy.

Omnicare notes with suspicion the underhanded tone implicit in the phrase "stalking horse," suggesting the phrase has a somewhat conspiratorial connotation. At his deposition, Phanstiel of PacifiCare was asked to provide a definition of the term, and responded as follows: "A stalking horse is a shield to conceal the hunter from the prey. Sometimes the phrase is used in the context of [a] decoy; sometimes the phrase is used in the context of creating confusion between the parties." (Phanstiel Dep. 65:19-23, Ex. 29 to Mem. in Opp'n.) Omnicare argues that UnitedHealth used RxSolutions as a stalking horse by figuratively hiding behind it, allowing RxSolutions to obtain a better rate and then taking advantage of that rate obtained by RxSolutions. According to Omnicare, this document makes no sense as a post-merger document because RxSolutions could not be used deceptively to benefit UnitedHealth once it was known that PacifiCare and RxSolutions were subsidiaries of UnitedHealth. But this is true only if Omnicare is correct about how a stalking horse strategy would operate: that is, using deceptive practices to enable the larger company to benefit from the more favorable terms offered to the smaller company. Given the context of the memo, however, particularly its focus on long-term strategic planning, this reading is not the most natural. Lois Quam, a UnitedHealth official involved in the discussions concerning the stalking horse memo, offered a less strained reading of the memorandum. Quam suggested that the stalking horse reference meant that UnitedHealth would keep RxSolutions as a subsidiary but not use it as its own PBM; rather, RxSolutions could be used to develop innovations "that could set a standard" that would make bargaining easier for UnitedHealth. (Quam Dep. 163:2-13, App. 207 to Reply Mem.) Omnicare's reading of the memorandum, while not completely implausible, is more

41

difficult to square with the actual text that makes the document read as though it is a post-merger planning document. Indeed, the stalking horse memorandum was attached to an e-mail discussing PBM strategy that was sent out in January 2006, after the merger had been completed. (1/20/06 e-mail, App. 168 to Mem. in Supp.) This fact is inconsistent with Omnicare's theory that the merging parties planned for RxSolutions to function as a stalking horse only before the two companies merged.

The court is sensitive to the concern that it should not take the place of the jury in weighing evidence at the summary judgment stage. *See High Fructose Corn Syrup*, 295 F.3d at 655. Nonetheless, guided by the standards established in *Monsanto* and *Matsushita*, the court concludes that Omnicare has failed to produce evidence of action by UnitedHealth and PacifiCare that is inconsistent with lawful conduct on the part of two competing entities engaged in legitimate merger discussions and planning. Notably, Omnicare was mindful of the UnitedHealth/PacifiCare merger plans at the time it entered into its agreement with RxSolutions, yet Omnicare apparently made no effort to include in that agreement a term that would have prohibited UnitedHealth from taking advantage of the lower rates for which RxSolutions had bargained. Not only is there no evidence that Omnicare attempted to negotiate such a provision, there is also nothing in the record that indicates that PacifiCare would have refused to accept it.

The court grants summary judgment in favor of Defendants on Count I of the Complaint.

## II.     State Law Claims

Omnicare's remaining claims against Defendants all arise under state law. The court has no independent jurisdiction for deciding these claims; diversity jurisdiction is lacking because Omnicare and PacifiCare are both incorporated in Delaware. (Defs.' 56.1 ¶ 4; 28 U.S.C. § 1332(a), (c)). Omnicare asserts that the state claims are within the court's supplemental jurisdiction. (Am. Compl. ¶ 18; 28 U.S.C. § 1367(a).) This court has discretion, however, to determine whether to exercise its supplemental jurisdiction when, as in this case, the original basis for federal jurisdiction

has been dismissed. 28 U.S.C. § 1367(c)(3). The court's decision should be guided by "the values of judicial economy, convenience, fairness, and comity." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) (quoting *City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 173 (1997)).

Three of these four factors favor the court's retention of jurisdiction. First, the interest in judicial economy overwhelmingly favors this court deciding the state law issues. The parties have filed tens of thousands of pages in exhibits and numerous briefs—including substantial briefing on the state law claims—and this court has devoted a considerable amount of resources to understanding the factual and legal arguments presented by the parties. Having a state court review many of the same documents to achieve an understanding of the factual and legal issues would be grossly inefficient. Second, it would be more convenient to the parties to have this court, which already has all the relevant discovery materials and legal briefs before it, to issue an opinion on this matter rather than to await a refiling in state court, particularly given the amount of time it would take a new court to become acquainted with the facts. Third, this resolution would also be more fair to the parties, who have devoted over three and one-half years to this matter; tellingly, neither party has argued that this court should surrender jurisdiction on the state claims if it granted summary judgment on the federal anti-trust claim.

The remaining interest identified by the Seventh Circuit, and the only one that favors dismissal of the state causes of action, is that of comity. This interest is reflected in the presumption recognized by the Seventh Circuit that district courts should usually relinquish jurisdiction over state claims when the federal claims are dismissed before trial. *Groce*, 193 F.3d at 501 ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."). This presumption, however, does not determine every case. *See, e.g.*, *CropLife America, Inc. v. City of Madison*, 432 F.3d 732, 734 (7th Cir. 2005) ("relinquishment [of the state claims] is not mandatory . . . [and] both sides want us to decide the state-law claim rather than protract the

litigation"); *Timm v. Mead Corp.*, 32 F.3d 273, 277 (7th Cir. 1994) ("especially when difficult and unsettled state law issues are not implicated by the pendent claims, it is entirely acceptable . . . for a federal court to decide those claims"); *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1182 (7th Cir. 1993). The presumption should not apply in this case. For one thing, the state law claims are not "novel or complex," 28 U.S.C. § 1367(c)(1); indeed, federal courts in this district routinely hear cases applying these state causes of action. *E.g.,Gas Tech. Inst. v. Rehmat*, 524 F. Supp. 2d 1058, 1070, 1073-74 (N.D. Ill. 2007) (fraud and conspiracy to commit fraud); *Munch v. Sears, Roebuck & Co.*, 2008 WL 4450307, at *6 (N.D. Ill. Sept. 30, 2008) (unjust enrichment). While Omnicare's state law claims are rather complex, their complexity derives more from factual nuance than from legal nuance, and this court is in a superior position to apply the complex facts to settled Illinois law. *See Brazinski*, 6 F.3d at 1182 (presumption applies most strongly when the state law is "unsettled").

The Seventh Circuit has identified two common scenarios where this presumption in favor of dismissal may be refuted: first, "where substantial federal judicial resources have already been expended on the resolution of the supplemental claims," and second, "where it is obvious how the claims should be decided." *Williams Electronics Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007). The court first notes that Omnicare essentially concedes that its claim under the Kentucky antitrust law does not survive summary judgment if its federal antitrust claim fails, and the court concludes that the state claim should be construed the same as the federal antitrust claim. *See Fieldturf, Inc. v. Sw. Recreational Indus., Inc.*, 235 F. Supp. 2d 708, 721 n.10 (E.D. Ky. 2002), *vacated in part on other grounds*, 357 F.3d 1266 (Fed. Cir. 2004) (granting summary judgment on federal and state antitrust claims because "the antitrust law of the Commonwealth is so similar to its federal counterpart, the Sherman Antitrust Act, and may be interpreted where appropriate with regard to federal law, the Court shall dispatch [sic] with the claim under KY. REV. STAT. 367.175 upon its analysis of the federal antitrust claim"). The court therefore grants summary judgment on

Count II of the Complaint, as resolution of the state antitrust claim is "obvious" given the court's disposition of the federal antitrust claim. As for the other state law claims—for fraud, conspiracy to commit fraud, and unjust enrichment—the court has clearly, as discussed above, expanded substantial judicial resources on their resolution.

In sum, the interests of judicial economy, convenience, and fairness all favor having this court determine the state law issues. The sole countervailing factor, comity, is not substantially implicated here because the state law claims are not novel, but are rather claims that courts in this district regularly encounter. The court therefore proceeds to consider these remaining counts.

### A.    Fraud

Omnicare alleges that UnitedHealth fraudulently misrepresented the post-merger intentions of UnitedHealth and PacifiCare. On October 17, 2005, Tim Bien of Omnicare sent UnitedHealth representative Craig Stephens an e-mail concerning the merger, inquiring, "When the deal closes, will PacifiCare be contracted with Omnicare as a result of the acquisition?" (10/17/05 e-mail from Bien to Stephens, Ex. 83 to Mem. in Opp'n.) Two weeks later, on October 31, Stephens replied in a two-sentence e-mail: "PacifiCare's Part D offering for 2006 is a unique contract with CMS. If and when the deal closes, PacifiCare will follow their own Part D product strategy throughout the 2006 calendar year." (10/31/05 e-mail from Stephens to Bien, Ex. 83 to Mem. in Opp'n.) Omnicare contends that this e-mail was materially false or misleading and that Omnicare relied upon the e-mail to its detriment by entering into negotiations with PacifiCare and ultimately agreeing to the "Any Willing Provider" contract that UnitedHealth later joined. Defendants move for summary judgment, arguing that no genuine issue of material fact exists that would allow Omnicare to establish the elements of the claim.

### 1.    Choice of Law

Before analyzing the fraud claim itself, the court must determine whether Kentucky or Illinois law applies. Generally, when a court obtains jurisdiction over an action as the result of a transfer

45

of venue, the choice-of-law rules of the transferring court apply. *See Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964). Applying the rule to the present case, this court would apply Kentucky choice-of-law rules in determining which state's tort law should govern the fraud claim because the action was transferred to this court from a Kentucky district court. However, the *Van Dusen* rule is intended to prevent defendants from seeking a transfer merely to obtain more favorable choice-of-law rules. *See id.* In this case, where a forum selection clause in the WHI-Omnicare agreement states that Illinois courts "shall have exclusive jurisdiction over the parties," applying the *Van Dusen* rule would more likely allow the plaintiff to manipulate the choice-of-law rules to be applied by filing the action in a different court. *See Freedman v. Am. Online, Inc.*, 325 F. Supp. 2d 638, 652 (E.D. Va. 2004) ("[A]pplying the usual *Van Dusen* rule in the face of a forum selection clause encourages forum shopping by a party seeking to avoid the application of the contractually-chosen forum.") Thus, because this case was transferred to this court by means of a forum selection clause, the choice-of-law rules of Illinois should govern rather than those of Kentucky.

The court accordingly applies Illinois law to determine whether the WHI-Omnicare Agreement's choice-of-law clause, which would apply the common law of Illinois to the fraud claims, governs this claim. In addition to its forum selection clause, the Agreement also states that the contract "will be construed and governed according to the laws of the State of Illinois." (WHI-Omnicare Agreement at 20, App. 58 to Mem. in Supp.) By its terms, this clause does not directly apply to Omnicare's fraud claim because the claim does not require the court to construe the Agreement. Even when a choice-of-law clause lacks the breadth to encompass a related tort claim, however, "tort claims that are dependent upon the contract are subject to a contract's choice-of-law clause." *Medline Indus. Inc. v. Maersk Med. Ltd.*, 230 F. Supp. 2d 857, 862 (N.D. Ill. 2002). One important factor in determining whether the tort claim "depends upon" the contract is whether the claim could exist without the contract. *M. Block & Sons, Inc. v. IBM Corp.*, No. 04 C 340, 2004 WL 1557631, at *4 (N.D. Ill. July 8, 2004); *Birnberg v. Milk St. Res. Assocs. Ltd. P'ship*, No. 02 C 978,

46

2003 WL 151929, at *14 (N.D. Ill. Jan. 21, 2003). Here, the entire purpose behind Bien's initial e-mail—and presumably Stephens's response to it—was to determine whether PacifiCare would be swept into the WHI-Omnicare Agreement. The claim for fraud could not have existed without the Agreement, then, and so the claim is dependent upon the contract. Therefore, Illinois fraud law applies.

The elements of a fraud claim in Illinois are: (1) that the defendant made a false statement of material fact, (2) the defendant knew or believed it was false, (3) the defendant intended to induce plaintiff to act, (4) the plaintiff justifiably relied on the statement, and (5) the plaintiff was injured as a result. *Assoc. Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 852 (7th Cir. 2007) (quoting *Williams v. Chi. Osteopathic Health Sys.*, 274 Ill. App. 3d 1039, 1048, 654 N.E.2d 613, 619 (1st Dist. 1995)). As explained below, Omnicare's claim falters on the first element: Omnicare cannot show that a genuine issue of material fact exists that UnitedHealth made a false statement of material fact.

## 2. False Statement of Material Fact

Defendants contend that summary judgment should be granted because nothing in Stephens's e-mail was false.[17] Omnicare does not seriously contest the literal truth of the statements in the e-mail, but nevertheless argues that the representations made by Stephens are actionable because they were materially misleading. "A representation is fraudulent when, to the knowledge or belief of its utterer, it is false in the sense in which it is intended to be understood by the recipient." *Miller v. Lockport Realty Group, Inc.*, 377 Ill. App. 3d 369, 377, 878 N.E.2d 171, 179 (1st Dist. 2007) (quoting *Soderlund Bros., Inc. v. Carrier Corp.*, 278 Ill. App. 3d 606, 619, 663 N.E.2d 1, 10 (1st Dist. 1995)). Essentially, Omnicare asserts that UnitedHealth attempted to convey to Omnicare that UnitedHealth and PacifiCare were pursuing their Part D strategies

---

[17]     Defendants do not appear to dispute the materiality of the e-mail.

separately, when in fact they were coordinating them. Omnicare's interpretation of the statement is more sinister than the court's, in two ways. First, the e-mail does not say that UnitedHealth and PacifiCare would remain entirely independent throughout 2006 in their Part D approaches, only that PacifiCare "will follow [its] own Part D product strategy." Stephens was responding to the question of whether PacifiCare would be a party to the WHI-Omnicare Agreement and stated that PacifiCare would follow its own strategy. As a reply to Bien's question, this statement is truthful, as PacifiCare eventually did reach its own agreement with Omnicare. Omnicare did not ask whether UnitedHealth would try to join a contract into which Omnicare and PacifiCare might enter; so Omnicare's suggestion that UnitedHealth meant to convey a message that UnitedHealth would not try to join a contract made between Omnicare and PacifiCare (who were not even negotiating with one another at this time) is unlikely and unsupported by the record. Stephens's reply clearly indicated that PacifiCare would not be a party to the WHI Agreement, and was therefore true both literally and in its intended message.

Second, Omnicare has not established the existence of a genuine issue of material fact that the merging parties were in fact coordinating their Part D strategies at this point in time. Omnicare's best evidence consists of general statements made by high-level officials of UnitedHealth and PacifiCare stressing their interest in combining networks and contracts to achieve economies of scale. (Erlandson Dep. 66:11-19, Ex. 63 to Mem. in Opp'n ("if contractually [UnitedHealth is] able to get access to PacifiCare networks, to the extent that they have better contracts . . . that would create value"). For the reasons already explained in Part I, there is nothing invidious about this, as presumably the entities decided to merge for the purpose of becoming more efficient. These statements are also so general that they do not directly implicate Part D coordination generally or Omnicare specifically. The closest Omnicare comes is pointing to an e-mail from UnitedHealth's Pfotenhauer on December 3, 2005. Discussing the upcoming merger, Pfotenhauer wrote,

> For Part D[,] I see one of our major foci next year to further examine the end to end

48

> production process and re-calibrate whether we still need as many outsourced
> vendors. Someone looking beyond Part D might see some additional synergies that
> would not be immediately discerned in Part D.

(12/3/05 e-mail from Pfotenhauer to Jelinek, Ex. 177 to Mem. in Opp'n.) Again, all this shows is that

the merging entities hoped to increase efficiency after the merger, even with respect to Part D. This

e-mail does not support a finding that the companies had already engaged in a coordinated plan

*vis a vis* Omnicare. Indeed, it actually suggests the opposite, as all the references are to what

people in the next year could accomplish, not what has already been done. If Omnicare cannot

show that Defendants were coordinating their Part D strategies, then the e-mail quite simply cannot

be fraudulent.

Omnicare also attempts to create a genuine issue of material fact concerning whether the

merging entities had developed a coordinated Part D plan through circumstantial evidence of

communications Stephens had with other UnitedHealth officials prior to replying to Bien's e-mail.

Although Stephens generally replied promptly to Bien's e-mails, he did not quickly respond to this

one, prompting Bien to send a second e-mail one week later, asking, "Craig, Can you give me

anything on this? Tim." (10/25/05 e-mail from Bien to Stephens, Ex. 217 to Mem. in Opp'n.)

Stephens still did not reply until October 31. In the interim, Stephens conferred with other

UnitedHealth officials concerning the appropriate response to provide to Bien. According to

Stephens, he delayed responding to Bien "because what he was asking for . . . would have required

me to, you know, go down a path that I could not go down." (Stephens Dep. 291:14-18, Ex. 108

to Mem. in Opp'n.) Omnicare deems this vague statement conspiratorial and argues that it

suggests that a secret agreement existed between UnitedHealth and PacifiCare that Stephens was

afraid of exposing. Stephens clarified what he meant, however, stating that he did not want to give

Bien "guidance as to what's going to happen post-acquisition with contracts when I have had no

interaction with PacifiCare. And on top of that, I've been instructed to have no interaction with

PacifiCare." (*Id.* at 291:20-25.) Furthermore, Stephens stated that no one he contacted suggested

possible ways for him to respond to the e-mail.  Nor did any of the other individuals to whom he spoke have any memory of giving substantive input to the response.[18]  (*Id.* at 292:7-13; Pfotenhauer Dep. 117:19-118:24, Ex. 115 to Mem. in Opp'n.)  Once pieced together, this evidence is insufficient to support a finding that UnitedHealth and PacifiCare had developed a coordinated strategy that Stephens was very carefully trying to avoid divulging.

Fundamentally, the fraud count is based upon UnitedHealth's failure to answer a question that Omnicare did not ask.  In Bien's e-mail, Omnicare asked whether PacifiCare would become contracted with Omnicare as a result of the merger.  If Omnicare wanted to know the degree to which the merged entities might coordinate their Part D planning and sharing of contracts, it could have asked a broader question concerning general post-merger plans for the combined entity.[19] Omnicare asked only whether PacifiCare would enter into the WHI Agreement (not whether UnitedHealth might enter into any agreement Omnicare might reach with PacifiCare); Stephens replied that PacifiCare was following its own Part D strategy—a truthful statement, as PacifiCare ultimately entered its own contract with Omnicare and never used the WHI Agreement. Contrary to Omnicare's contention in the Complaint, the Stephens e-mail does not give "the impression that UHG would not attempt to transfer its Part D plans to PHS after the merger" because Bien's e-mail to Stephens clearly asked about the opposite situation: whether PacifiCare would enter into UnitedHealth's existing contract.  (Am. Compl. ¶ 11.)  In fact, after receiving the Stephens e-mail, Bien forwarded the e-mail to Joel Gemunder, President and CEO of Omnicare, and wrote, "PacifiCare will not be included with the United Part D offering."  (11/1/05 e-mail from Bien to

---

[18]     In the case of Ann Tobin, UnitedHealth claimed attorney-client privilege to prevent her from answering.  (Tobin Dep. 220:11-15, Ex. 109 to Mem. in Opp'n.)  Omnicare does not appear to have challenged the assertion that communications with Tobin were privileged.

[19]     Of course, UnitedHealth may have declined to answer such a detailed question, to the extent that it had an answer at this point prior to the closing of the deal.  Whether UnitedHealth would or could have answered such a question is, of course, a question the record does not answer.

Gemunder, Ex. 308 to Mem. in Opp'n.)  Bien's understanding of the message was therefore in accord with what actually happened, namely, that PacifiCare and Omnicare would need to reach their own LTC agreement if they were to be contracted with one another.  Nor was the intended meaning misleading.  The clear import of the Stephens e-mail was that Omnicare would not automatically be contracted with PacifiCare as a result of the merger; if Omnicare and PacifiCare did not reach their own contract, then they would not do business together.  Omnicare has made no showing to suggest that this was not true.  Thus, even if Omnicare is unhappy with the results of its contracting with PacifiCare, it cannot protest the contract on the grounds of fraud.  Neither the literal terms of the e-mail nor its intended meaning were false.

### B.      Conspiracy to Commit Fraud

Omnicare also contends that UnitedHealth and PacifiCare conspired to defraud Omnicare. To sustain a claim for conspiracy to defraud in Illinois, a plaintiff must show: "(1) a conspiracy; (2) an overt act of fraud in furtherance of the conspiracy; and (3) damages to the plaintiff as a result of the fraud."  *Bosak v. McDonough*, 192 Ill. App. 3d 799, 803, 549 N.E.2d 643, 646 (1st Dist. 1989).  None of these elements are met.  As stated above, Omnicare has failed to establish the existence of a genuine issue as to an agreement between UnitedHealth and PacifiCare regarding either Omnicare or LTC strategies generally.  Furthermore, the second element of conspiracy requires an act of fraud which, as noted above in granting summary judgment on the fraud claim, Omnicare has also failed to establish.  *See Damato v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 878 F. Supp. 1156, 1162 (N.D. Ill. 1995) ("[T]o state a valid conspiracy to defraud claim[,] plaintiffs must allege facts establishing the elements of fraud under Illinois law.").  And in the absence of fraud, Omnicare can show no injury caused by the fraud.  The court thus grants summary judgment in favor of defendants on Omnicare's conspiracy claim.

### C.      Unjust Enrichment

In a separate count, Omnicare claims that it is entitled to recovery because Defendants were

unjustly enriched by "the improper utilization by UHG and PHS of the noncompetitive reimbursement rate schedule contained within the PHS Any Willing Provider Contract." (Compl. ¶ 96.) A cause of action for unjust enrichment requires a showing that "the defendant has unjustly retained a benefit to the plaintiff's detriment, and the defendant's retention of that benefit violates" basic principles of justice. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160, 545 N.E.2d 672, 679 (1989). The Illinois Supreme Court has identified three situations where the defendant's retention of a benefit will be considered unjust:

> (1) the benefit should have been given to the plaintiff, but [a] third party mistakenly gave it to the defendant instead . . . , (2) the defendant procured the benefit from [a] third party through some type of wrongful conduct . . . , or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant . . . .

*Id.* at 161-62, 545 N.E.2d at 679 (internal citations omitted); *see also Assoc. Ben. Servs.*, 493 F.3d at 854 (citing *HPI*). Illinois courts do not appear to have uniformly followed this guidance, however; some courts have required a more specific showing than suggested by the court in *HPI*. *See, e.g.*, *McKay v. Kusper*, 252 Ill. App. 3d 450, 463, 624 N.E.2d 1140, 1150 (1st Dist. 1993) (requiring "unlawful or improper conduct as defined by law" for unjust enrichment claim to succeed); *Lewis v. Lead Indus. Ass'n, Inc.*, 342 Ill. App. 3d 95, 105, 793, N.E.2d 869, 877 (1st Dist. 2003) ("In order for a cause of action for unjust enrichment to exist, there must be some independent basis which establishes a duty on the part of the defendant to act and the defendant must have failed to abide by that duty").

In short, the "law of unjust enrichment in Illinois is unclear." *Cohabaco Cigar Co. v. U.S. Tobacco Co.*, No. 98 C 1580, 1999 WL 988805, at *15 (N.D. Ill. Oct. 22, 1999); *see also C.B. Mills v. Hawranik*, No. 91 C 5797, 1994 WL 113088, at *15 (N.D. Ill. Mar. 30, 1994). A lack of clarity in the state law would normally suggest that the court should decline to resolve the issue, *see* 28 U.S.C. § 1367(c)(1), but in this case the lack of clarity is immaterial for two reasons. First, the courts have clearly held that "where there is a specific contract that governs the relationship of the

parties," a plaintiff cannot assert a claim for unjust enrichment. *Stathis v. Geldermann, Inc.*, 295 Ill. App. 3d 844, 864, 692 N.E.2d 798, 812 (1st Dist. 1998) (citing *People ex rel. Hartigan v. E & E Hauling, Inc.*, 153 Ill. 2d 473, 497, 607 N.E.2d 165, 177 (1992)). Omnicare had contracts with all of the defendants in this case and therefore cannot proceed under an unjust enrichment theory.

Second, and more fundamentally, there are simply no grounds to support recovery regardless of what standard of conduct applies. Omnicare claims that Defendants were unjustly enriched "[a]s a result of the illegal conspiracy between UHG and PHS, including, in particular, UHG's fraudulent misrepresentation in its October 31st e-mail, and the scheme to devise a fraudulent strategy for PHS to refuse to negotiate with Omnicare." (Am. Compl. ¶ 96.) For the reasons already discussed in this opinion, however, none of these alleged misdeeds took place—there was no illegal conspiracy between UnitedHealth and PacifiCare; UnitedHealth made no fraudulent misrepresentation in the October 31st e-mail; and there was no fraudulent scheme that resulted in PacifiCare refusing to negotiate with Omnicare. Omnicare has failed to demonstrate the existence of a genuine issue of material fact regarding any of the factual predicates which would allow recovery under a theory of unjust enrichment. *Cf. Ass'n Ben. Servs.*, 493 F.3d at 855 ("[W]hen the plaintiff's particular theory of unjust enrichment is based on alleged fraudulent dealings and we reject the plaintiff's claims that those dealings, indeed, were fraudulent, the theory of unjust enrichment that the plaintiff has pursued is no longer viable."). Therefore, under any theory of unjust enrichment, Defendants are entitled to summary judgment.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment on all claims in Omnicare's First Supplemental and Amended Complaint [556] is granted. Plaintiff's Motion for Partial Summary Judgment Pursuant to Rule 56 Or in the Alternative Motion to Strike [571] is denied. Defendants' Motion to Strike Certain of Omnicare's Responses [641] is stricken as moot.

ENTER:

Dated:  January 16, 2009

_____
REBECCA R. PALLMEYER
United States District Judge